RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RIVERVIEW HEALTH INSTITUTE LLC;
MIDDLETOWN SURGICAL ASSOCIATES INC.,
dba Surgical Weight Loss Center; OAK LEAF
HEALTH GROUP LLC, dba St. Elizabeth's
Laboratories,

              _Plaintiffs-Appellants,_

      _v._

MEDICAL MUTUAL OF OHIO; KENT W. CLAPP;
DAVID G. QUIRING; KATHY SCHNEEBERGER,
              _Defendants-Appellees._

No. 08-4431

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 07-00354—Thomas M. Rose, District Judge.

Argued: October 8, 2009

Decided and Filed: April 7, 2010

Before: RYAN, COLE, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kenneth A. Lazarus, LAZARUS & ASSOCIATES, Washington, D.C., G. Robert Blakey, NOTRE DAME LAW SCHOOL, Notre Dame, Indiana, for Appellants. James D. Thomas, SQUIRE, SANDERS & DEMPSEY L.L.P., Miami, Florida, for Appellees. **ON BRIEF:** Kenneth A. Lazarus, LAZARUS & ASSOCIATES, Washington, D.C., G. Robert Blakey, NOTRE DAME LAW SCHOOL, Notre Dame, Indiana, for Appellants. James D. Thomas, SQUIRE, SANDERS & DEMPSEY L.L.P., Miami, Florida, Philip M. Oliss, Mark J. Savage, SQUIRE, SANDERS & DEMPSEY L.L.P., Cleveland, Ohio, Pierre H. Bergeron, SQUIRE, SANDERS & DEMPSEY L.L.P., Cincinnati, Ohio, Michael E. Smith, Stephen F. Gladstone, FRANTZ WARD LLP, Cleveland, Ohio, for Appellees. W. Scott Myers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amicus Curiae.

1

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   Plaintiffs, Riverview Health Institute LLC; Middletown Surgical Associates Inc. d/b/a Surgical Weight Loss Center; and Oak Leaf Health Group LLC d/b/a St. Elizabeth's Laboratories, appeal an order entered by the district court dismissing Plaintiffs' claims filed pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, as reverse preempted by Ohio state law, pursuant to the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.*, and denying leave for Plaintiffs to amend their complaint and add a claim for federal estoppel.  For the reasons set forth below, we **AFFIRM** the district court's decision.

## I. BACKGROUND

### A.     Factual Background

Plaintiff Riverview Health Institute LLC ("Riverview") is a small, private specialty hospital located in Dayton, Ohio.  Riverview provides hospital services related to bariatrics, plastic surgery, orthopedics, gynecology, interventional radiology, and other surgical procedures.  Plaintiffs Middletown Surgical Associates, Inc. and Oak Leaf Health Group LLC provide physician and laboratory services, respectively.   Middletown Surgical Associates does business in Ohio as the Surgical Weight Loss Center ("SWLC") and is the professional practice corporation of Dr. David J. Fallang, a bariatric and general surgeon. Plaintiff Oak Leaf Health Group LLC ("Oak Leaf") does business in Ohio as St. Elizabeth's Laboratories.  SWLC provides bariatric and general surgery services at Riverview, while Oak Leaf provides laboratory services to patients at Riverview and SWLC.  Plaintiffs conduct their business at One Elizabeth Place in Dayton, Ohio.

Defendant Medical Mutual of Ohio ("Medical Mutual") is a health insurance company and the individual defendants are its officers.  Defendant Kent W. Clapp is its President, David G. Quiring is its Vice President for Claims Operations, and Kathy Schneeberger is its Senior Financial Investigator.

All Plaintiffs are out-of-network providers of health care services and do not maintain any contractual agreements with health insurance carriers. Instead, Plaintiffs are paid for their services by direct patient payments and private insurance proceeds to the extent patients' insurance provides out-of-network coverage. All insureds must complete and sign a formal Assignment of Medical Benefits prior to the receipt of any medical service or procedure. Plaintiffs allege that from January 2004 to August 2006, Medical Mutual "frequently delayed, underpaid and/or denied claims submitted to it by [Plaintiffs] but continued to do business with them." (Br. of Appellant 7.)

On August 8, 2006, Medical Mutual sent Dr. Fallang a letter stating that the Financial Investigations Department at Medical Mutual had performed a review of claims and clinical information Fallang submitted for payment and determined that "many of the billings submitted did not accurately reflect the services performed" and that "[a]s a result, services were paid by [Medical Mutual] that should not have been paid." (R. at 43.) Included in the letter was a summary of billing issues Medical Mutual said it had identified and a statement that Medical Mutual sought to recover $796,629.41 from Riverview. Medical Mutual also stated in the letter that until this matter was resolved, "claims currently on hold and future claims will be rejected since the numerous billing issues can not [sic] be corrected by [Medical Mutual]." (R. at 44.) Riverview did not respond to Medical Mutual's August 8, 2006 letter.

On September 19, 2006, Medical Mutual sent Dr. Fallang another letter referencing its August 8, 2006 letter and the lack of response from Riverview. The September 19, 2006 letter also stated that Riverview's failure to respond within fourteen days would result in Medical Mutual pursuing other legal remedies. Dr. Fallang responded in a letter dated October 2, 2006, noting the seriousness of Medical Mutual's allegations and requesting as much detail as possible regarding Medical Mutual's billing concerns and a detailed calculation of the amount Medical Mutual was seeking to recover.

Medical Mutual replied via a letter dated January 10, 2007 accompanied by several attachments detailing Medical Mutual's billing concerns. In the January 10, 2007 letter, Medical Mutual noted that it would pursue its legal remedies if Riverview failed to respond within ten days. Riverview never responded to the January 10, 2007 letter.

**B.        Procedural History**

On September 24, 2007, Plaintiffs filed a verified complaint in the United States District Court for the Southern District of Ohio setting forth seven claims for relief: (1) conspiracy to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d); (2) violation of 18 U.S.C. § 1962(c); (3) conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d); (4) denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B); (5) state-based breach of contract; (6) state-based common-law fraud; and (7) state-based tortious interference with business relationships.  The first three claims arise under the federal RICO statute, 18 U.S.C. § 1961, *et seq.*, the fourth under the federal ERISA statute, 29 U.S.C. § 1001, *et seq.*, and the district court had subject matter jurisdiction over the last three by virtue of 28 U.S.C. § 1367.

According to the complaint, Medical Mutual "acted to delay, diminish and deny payment of . . . lawful claims of patient-insureds as submitted by out-of-network health providers . . . through a scheme or artifice, utilizing the U.S. Mail and demonstrating a specific intent to defraud the patient-insureds and out-of-network health-care providers in violation of 18 U.S.C. § 1341."  (R. at 22.)  The complaint also avers that Medical Mutual "acted unlawfully and inaccurately to underestimate and reduce the ['usual, customary and reasonable'] amounts due to out-of-network health providers through scheme or artifice, utilizing the U.S. mail."  (R. at 22.)  Additionally, the complaint alleges that Medical Mutual of Ohio has "inappropriately bundled provider services and procedures through scheme or artifice, utilizing the U.S. mail."  (R. at 23.)

On December 5, 2007, Defendants filed a motion to dismiss for, *inter alia*, reverse preemption,[1] pursuant to the McCarran-Ferguson Act, of Plaintiffs' federal RICO claims by Ohio laws regulating the business of insurance.  Plaintiffs opposed Defendants' motion to dismiss and submitted a cross-motion for leave to amend the complaint.  On September 30, 2008, the district court granted Defendants' motion to dismiss,

---

[1]Reverse preemption is a form of inverse preemption that prevents a generally applicable federal law from inadvertently invalidating, impairing, or superseding state laws enacted to regulate the business of insurance.  *See Humana Inc. v. Forsyth*, 525 U.S. 299, 306-07 (1999); *see also Ojo v. Farmers Group, Inc.*, 565 F.3d 1175, 1179 (9th Cir. 2009).

concluding that Plaintiffs' RICO claims were reverse preempted and dismissing them with prejudice.  The district court denied Plaintiffs' request to amend their verified complaint to include a federal estoppel claim, finding that Plaintiffs' amendment would be futile.  The district court subsequently dismissed Plaintiffs' remaining claims without prejudice.  Plaintiffs appeal the dismissal of their RICO claims, arguing that such claims do not fall within the McCarran-Ferguson Act and therefore, are not reverse preempted.  Plaintiffs also appeal the denial of their motion to amend and add a federal estoppel claim.

## II.  DISCUSSION

### A.        Standard of Review

We review *de novo* a district court's dismissal of a suit pursuant to Fed. R. Civ. P. 12(b)(6).  *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is designed to test the sufficiency of the complaint.  "The district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Id.* (citing *Allard v. Weitzman* (*In re DeLorean Motor Co.*), 991 F.2d 1236, 1240 (6th Cir. 1993)).  Therefore, a motion for dismissal pursuant to Rule 12(b)(6) will be granted if the facts as alleged are insufficient to make a valid claim or if the claim shows on its face that relief is barred by an affirmative defense.  In a situation involving an affirmative defense, "the claim is stated adequately . . . , but in addition to the claim the contents of the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim.  In [such a] situation[] the complaint is said to have a built-in defense and is essentially self-defeating." 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).

A district court's order denying a Rule 15(a) motion to amend is usually reviewed for an abuse of discretion.  "Although a district court has discretion to deny a motion to amend a complaint after an answer has been filed, [this Court] ha[s] held on

several occasions that a district court abuses its discretion when it fails to state a basis for its decision to deny a motion to amend." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). However, such an abuse of discretion "could amount to a harmless error if adding [the] proposed amendment would have been futile." *Id.* "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Id.* (citing *Thiokol Corp. v. Dep't of Treasury, State of Michigan, Revenue Div.*, 987 F.2d 376, 382-83 (6th Cir. 1993)). Because the district court denied Plaintiffs' motion for leave to amend on the basis of futility, this Court reviews the district court's denial of Plaintiffs' motion *de novo*. *Midkiff v. Adams County Reg'l Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005).

### B.       Plaintiffs' RICO Claims

Plaintiffs argue that Medical Mutual, in its processing of insurance claims, violated the federal RICO statute. Specifically, Plaintiffs allege that Medical Mutual "acted to delay, diminish and deny payment of . . . lawful claims of patient-insureds as submitted by out-of-network health providers . . . through a scheme or artifice, utilizing the U.S. Mail and demonstrating a specific intent to defraud the patient-insureds and out-of-network health-care providers." (Compl. ¶ 51.)

Federal RICO takes aim at "racketeering activity." *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"). In order to establish racketeering activity, a plaintiff must allege a predicate act. Riverview has alleged mail fraud, which satisfies the predicate act requirement. 18 U.S.C. § 1961(1)(B). Mail fraud consists of a scheme or artifice to defraud and a mailing for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8 (1954); *Bender v. Southland Corp.*, 749 F.2d 1205, 1215-16 (6th Cir. 1984). A scheme to defraud involves "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Bender*, 749 F.2d at 1216 (quoting *Epstein v. United States*, 174 F.2d 754, 765 (6th Cir. 1949)) (emphasis omitted).

Pursuant to 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation of § 1962" may bring a private action. Section 1962 makes it unlawful for any person to: (1) use income derived from a "pattern of racketeering activity," to acquire interest in or establish operation of any enterprise engaged in, or the activities of which affect, interstate commerce; (2) through a pattern of racketeering activity, acquire or maintain an interest in or control of any enterprise engaged in, or the activities of which affect, interstate commerce; (3) through a pattern of racketeering activity, conduct or participate in the conduct of an enterprise engaged in, or the activities of which affect, interstate commerce; or (4) conspire to violate any provision of Section 1962. 18 U.S.C. § 1962. Riverview has alleged violations of the first and third prohibitions set forth in Section 1962.

### C.     The McCarran-Ferguson Act

Defendants contend, and the district court agreed, that Riverview's RICO claims are reverse preempted in accordance with the McCarran-Ferguson Act. Plaintiffs argue that McCarran-Ferguson does not apply to its RICO claims. For the following reasons, we hold that Plaintiffs' federal RICO claims are reverse preempted by the McCarran-Ferguson Act.

The McCarran-Ferguson Act states that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a). Moreover, the McCarran-Ferguson Act declares that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."[2] *Id.* § 1012(b). Thus, this provision provides for "reverse preemption" when regulation of the business of insurance is involved. *Genord v. Blue*

---

[2]The McCarran-Ferguson Act also sets forth an "antitrust exception" to the reverse preemption rule. This exception provides that the Clayton Act, the Sherman Act, and the Federal Trade Commission Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b).

*Cross & Blue Shield of Mich.*, 440 F.3d 802, 805 (6th Cir. 2006). Nonetheless, courts should narrowly construe the McCarran-Ferguson Act. *See SEC v. Nat'l Sec., Inc*. 393 U.S. 453, 459-60 (1969) ("Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the [McCarran-Ferguson Act] apply.").

Determining whether the reverse preemption rule applies requires us to answer three questions. First, we must decide "whether the federal statute at issue 'specifically relates to the business of insurance.'" *Genord*, 440 F.3d at 805. If it does, then the McCarran-Ferguson Act, by its own terms, does not permit reverse preemption. 15 U.S.C. § 1012(b) (establishing an exception to the reverse preemption rule where federal law "specifically relates to the business of insurance."). If it does not, then in order for the federal RICO statute to be reverse preempted by state law, we must answer both remaining questions affirmatively—"whether the state statute at issue was enacted . . . for the purpose of regulating the business of insurance" and "whether the application of the federal statute would invalidate, impair, or supersede the state statute." *Genord*, 440 F.3d at 805-06 (internal quotation marks omitted). Neither party disputes that RICO does not specifically relate to the business of insurance. *See Kenty v. Bank One, Columbus, N.A.*, 92 F.3d 384, 391 (6th Cir. 1996). Accordingly, our analysis will focus on the "business of insurance" requirement and whether the application of RICO will "invalidate, impair, or supersede" Ohio insurance law.

### 1.          The "Business of Insurance" Requirement

Plaintiffs contend that their federal RICO claims do not fall within the ambit of the "business of insurance" requirement for reverse preemption. We disagree.

In *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119 (1982), the Supreme Court articulated three criteria that determine whether an activity is part of the "business of insurance": (1) "whether the practice has the effect of transferring or spreading a policyholder's risk," (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured," and (3) "whether the practice is

limited to entities within the insurance industry." *Id*. at 129; *see also Genord*, 440 F.3d at 806.

No one factor is dispositive. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 358 (6th Cir. 2008). When determining whether a state statute addresses the "business of insurance" under the McCarran-Ferguson Act, "the focus is on how to characterize *conduct* undertaken by private actors, rather than how to characterize *state laws* in regard to what they regulate." *Id.* (quoting *Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 337 (2003)) (internal quotation marks omitted). The McCarran-Ferguson Act's general rule includes "a broad category of laws . . . [that] necessarily encompasses more than just the 'business of insurance.'" *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 505 (1993). This Court has held that "to have been enacted . . . for the purpose of regulating the business of insurance, [the state law] must possess the aim of regulating activities that meet the *Pireno* criteria set forth above." *Genord*, 440 F.3d at 806 (quoting *Owensboro Nat'l Bank v. Stephens*, 44 F.3d 388, 392 (6th Cir. 1994)) (internal quotation marks omitted) (alteration in original).

In determining what is integral to the policy relationship, "the focus is on the extent to which the state law furthers the interests of the policyholders." *Id.* at 807. Therefore, "[w]hat constitutes an 'integral part of the policy relationship' is . . . determined by reference to the interests of the policyholders." *Id.* at 808. "Where a state law protects state insurance-policyholders, it is a 'law enacted . . . for the purpose of regulating the business of insurance.'" *AmSouth Bank v. Dale*, 386 F.3d 763, 781 (6th Cir. 2004).

The inquiry into whether the state statute at issue seeks to regulate a practice that is limited to entities within the insurance industry is not determinative but "courts should take this factor into account because '[a]rrangements between insurance companies and parties outside the insurance industry can hardly be said to lie at the center of [the] legislative concern' of 'protect[ing] *intra*-industry cooperation in the underwriting of risks.'" *Genord*, 440 F.3d at 808 (alterations in original).

In *United States Department of Treasury v. Fabe*, the Supreme Court held that "[t]here can be no doubt that the actual performance of an insurance contract falls within the business of insurance." 508 U.S. at 503 (internal quotation marks omitted). The Court added:

> Without performance of the terms of the insurance policy, there is no risk transfer at all. Moreover, performance of an insurance contract also satisfies the remaining prongs of the *Pireno* test: It is central to the policy relationship between insurer and insured and is confined entirely to entities within the insurance industry.

*Id.* at 504.

In this case, Plaintiffs' complaint focuses on the idea that Medical Mutual "acted to delay, diminish and deny payment of . . . lawful claims of patient-insureds as submitted by out-of-network health providers . . . through a scheme or artifice, utilizing the U.S. Mail and demonstrating a specific intent to defraud the patient-insureds and out-of-network health-care providers." (Compl. ¶ 51.) These allegations relate to the actual performance of the insurance contract between Medical Mutual and its insureds, thus satisfying all three prongs of the *Pireno* test. Accordingly, Plaintiffs' federal RICO claims fall within the "business of insurance" requirement for reverse preemption. Our focus now turns to whether application of the federal RICO statute in this case will "invalidate, impair, or supersede" any provision of the state law.

### 2.      **"The Invalidate, Supersede, or Impair" Requirement**

Plaintiffs also argue that the application of the federal RICO statute in this instance would not "impair" Ohio's insurance regulatory scheme.[3] For the following reasons, we disagree.

---

[3]The term "invalidate" ordinarily means "to render ineffective, generally without providing a replacement rule or law." *Humana*, 525 U.S. at 307. To "supersede" means to "set aside, render unnecessary, suspend, or stay." Black's Law Dictionary 1437 (6th ed. 1990). Under these common definitions, RICO's application would neither "invalidate" nor "supersede" Ohio law. Thus, the parties agree that the key question is whether federal RICO's application would "impair" Ohio law. To "impair" means "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." Black's, *supra*, at 752.

"A party seeking to invoke McCarran-Ferguson cannot simply point to additional procedural measures included in a federal law without identifying some substantive aspect of the state law that is being invalidated, impaired or superseded. Thus, . . . this is fundamentally a question of what effect RICO has on the state law." *Kenty*, 92 F.3d at 392.

Ohio has enacted a comprehensive regulatory scheme to regulate the business of insurance. *See* Ohio Rev. Code § 3901.01 ("R.C."), *et seq.*; *Fabe*, 508 U.S. at 494 (noting that the Ohio statute at issue "was enacted as part of a complex and specialized administrative structure for the regulation of insurance companies from inception to dissolution"). Included in Title 39 of the Ohio Revised Code is the Prompt Pay Act, R.C. §§ 3901.38-3901.3814, which regulates the timely processing and payment of insureds' healthcare claims.

The Prompt Pay Act sets forth various time frames for processing insurance claims, including time frames for payment or denial of insurance claims. R.C. § 3901.381(B)(1). "[W]hen a third-party payer[4] receives from a provider[5] or beneficiary[6] a claim . . . the third-party payer shall pay or deny the claim not later than thirty days after receipt of the claim." *Id.* A third-party payer cannot "[e]ngage in any business practice that unfairly or unnecessarily delays the processing of a claim or the payment of any amount due for health care services" provided. *Id.* § 3901.385(A).

A provider or beneficiary aggrieved by any act believed to be a third-party payer violation of the Prompt Pay Act "may file a written complaint with the superintendent of insurance regarding the violation." *Id.* § 3901.3810. If, after investigation, the Superintendent finds that the third-party payer has committed a series of violations

---

[4] A "third-party payer" includes an insurance company. R.C. § 3901.38(F)(1).

[5] A provider "means a hospital, nursing home, physician, podiatrist, dentist, pharmacist, chiropractor, or other health care provider entitled to reimbursement by a third-party payer for services rendered to a beneficiary under a benefits contract." R.C. § 3901.38(D).

[6] A beneficiary "means any policyholder, subscriber, member, employee, or other person who is eligible for benefits under a benefits contract." R.C. § 3901.38(A).

constituting a consistent pattern or practice of failing to comply with Ohio's statutory requirements for processing claims, the Superintendent can impose a monetary fine, order the payment of interest, order the third-party payer to cease and desist conduct that violates the statute, and impose various other administrative remedies. *Id.* § 3901.3812(A)-(B). The Superintendent must give the third-party payer notice of the violation as well as the proposed penalty and conduct an administrative hearing if requested by the third-party payer. *Id.* § 3901.3812(A). In determining whether a consistent pattern or practice of violations has occurred, the Superintendent must "apply the error tolerance standards for claims processing contained in the market conduct examiners handbook issued by the national association of insurance commissioners in effect at the time the claims were processed." *Id.* The statute provides that "[t]he remedies imposed by the superintendent . . . are in addition to, and not in lieu of, . . . other remedies . . . providers and beneficiaries may otherwise have by law." *Id.* § 3901.3812(C).

In *Kenty v. Bank One, Columbus, N.A.*, this Court noted that "different liability under Ohio law for violations, as well as different standards of proof necessary to demonstrate misrepresentations, means that RICO does impair the ability of Ohio to regulate this type of behavior." 92 F.3d at 392. The Court added:

> applying RICO to insurance companies would subject them to a different standard of behavior than the one envisioned by Ohio. By holding insurance companies liable under a federal law, such as RICO, when Ohio law provides for no liability, RICO would impair the regulatory framework within which Ohio expects its insurance companies to do business.

*Id.*

Three years later in *Humana Inc. v. Forsyth*, 525 U.S. 299 (1999), the Supreme Court held that a federal statute that "proscribes the same conduct as state law, but provides materially different remedies" did not "impair" state law under the McCarran-Ferguson Act. 525 U.S. at 305, 310. "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared

state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310. In reaching its conclusion, the Court examined the interplay between RICO and the state insurance scheme at issue, pointing to several factors. The factors the Court examined in *Humana* include: (1) the availability of a private right of action under the state insurance scheme; (2) the availability of a state common law remedy; (3) the possibility that other state statutes provide the basis for suit; (4) the availability of punitive damages; (5) whether the damages available under the state insurance scheme could exceed the damages recoverable under RICO, even taking into account RICO's treble damages provision; (6) the absence of a position by the State regarding any interest in state policy or the administrative scheme; and (7) the fact that insurers have relied on RICO to eliminate insurance fraud. *Humana*, *Id.* at 311-14; *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 261 (3d Cir. 2007). We consider each of these factors in turn.

### a.      Availability of a Private Right of Action and Common Law Remedies

Ohio's insurance scheme does not afford a private right of action. Nonetheless, Plaintiffs contend that the absence of a private right of action is minimized by the fact that the Ohio insurance statute does not "expressly provide" or "necessarily imply" that the statute is the exclusive remedy under Ohio law for insurance fraud.

We find this argument unconvincing, particularly because Plaintiffs have no common law remedies available, which renders Ohio's Prompt Pay Act Plaintiffs' exclusive source of remedies. Although Plaintiffs cite claims for the tort of bad faith on the part of an insurance company and common law fraud, Plaintiffs have no such viable claims.

First, in order to assert a bad faith claim, the parties must have a contractual relationship. *See Gillette v. Estate of Gillette*, 837 N.E.2d 1283, 1287 (Ohio Ct. App. 2005) ("Given the contractual relationship requirement, Ohio courts have repeatedly held that a third-party claimant cannot assert bad-faith claims against an insurer.").

Plaintiffs have conceded that they have no contractual relationship with Medical Mutual, thus they have no viable bad-faith claim.

With regard to Plaintiffs' assertion that common law fraud is actionable, "[w]hen the legislature creates a statutory right unknown to the common law (as it did here, by specifying [procedures and remedies regarding the timely payment of insurance claims]), complete with meaningful statutory remedies, there can exist no parallel common-law or public policy tort claim." *Lynch v. Dial Fin. Co. of Ohio No. 1, Inc.*, 656 N.E.2d 714, 719 (Ohio Ct. App. 1995). The Ohio General Assembly has specified the remedies for violating the Prompt Pay Act and has therefore, preempted the field and a common law cause of action cannot be implied. *See id.* at 719-20.

Furthermore, several courts post-*Humana* have held that the McCarran-Ferguson Act bars the application of RICO where, as here, the state insurance scheme does not allow a private right of action for the conduct alleged by Plaintiffs. *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 (8th Cir. 2008) (affirming the McCarran-Ferguson Act's preemption of federal claims where Missouri insurance laws do not provide a private right of action for unfairly discriminatory insurance rates); *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 643 (8th Cir. 1999) (holding that the McCarran-Ferguson Act barred plaintiff's claims against insurers because Minnesota law only allowed administrative recourse and did not provide for a private right of action); *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1321-22 (S.D. Fla. 2002) (affirming dismissal of RICO claims filed by plaintiffs residing in California, Florida, New Jersey, and Virginia, because unlike the Nevada statute at issue in *Humana*, those states do not expressly provide a private cause of action  for victims of insurance fraud).

### b.      Other State Statutes

Plaintiffs contend that the fact that Ohio has a state RICO statute demonstrates that the federal RICO statute does not impair Ohio's insurance regulatory scheme, but rather aids or enhances state law. However, as Defendants point out, an insurer's alleged violation of the Prompt Pay Act does not constitute "corrupt activity" for purposes of

Ohio's RICO statute. *See* R.C. § 2923.31(I)(2)(c) (noting that a violation of R.C. § 2913.47, which criminalizes insurance fraud against insurers, constitutes "corrupt activity" for purposes of the state RICO statute). Thus, although Plaintiffs correctly assert that Ohio's RICO statute does not preclude recovery based on other claims of relief, *see* R.C. § 2923.34(L), such an argument is misplaced because Ohio's RICO statute would not apply to the instant case.

### c.    Damages

The treble damages available under the federal RICO statute would greatly exceed the administrative remedies available under Ohio law. *See* R.C. § 3901.22(F). "[T]he existing remedies [under Ohio's administrative scheme] are more than adequate to deter any unfair or deceptive trade practices." *Strack v. Westfield Cos.*, 515 N.E.2d 1005, 1008 (Ohio Ct. App. 1986). Ohio's insurance superintendent "is granted wide latitude and authority in overseeing insurance companies" and Ohio's insurance regulatory scheme "enables the superintendent to impose administrative remedies on an insurer who commits unfair or deceptive trade practices." *Id.* As we noted previously, Plaintiffs cannot state claims for either state common law fraud or the tort of bad faith by an insurer. Accordingly, permitting Plaintiffs to recover treble damages under the federal RICO statute would controvert Ohio's insurance regulatory scheme.

### d.    State's Position and the Use of RICO by Insurers

Plaintiffs initially claimed that the State's failure to intervene in this suit supported their position that application of the federal RICO statute would not frustrate any state policy or interfere with Ohio's administrative scheme. The State of Ohio subsequently filed a brief in support of Defendants as *amicus curiae*, arguing that application of federal RICO in this case would impair Ohio's insurance scheme, particularly the State's ability to detect insurance fraud. The State argues that its Department of Insurance must work with insurers to combat insurance fraud. The application of federal RICO, Ohio asserts, would have a chilling effect on an insurer's

incentive to detect fraud because in doing so, insurers would expose themselves to liability for federal RICO claims and treble damages.

As we previously noted, Ohio's RICO statute deems fraud against insurers to be "corrupt activity" for purposes of the statute. We find that this is an indication by the Ohio legislature that it considered the regulatory scheme set forth in the Prompt Pay Act to be sufficient to remedy and deter fraud perpetrated by insurers. Accordingly, insurers still have a cause of action under both Ohio and federal RICO for fraud perpetrated against them by insureds.

We conclude that application of federal RICO in this case would impair Ohio's insurance regulatory scheme. The conduct at the heart of Plaintiffs' complaint implicates Ohio's law regarding payment of claims and the Ohio Department of Insurance is charged with administering the applicable state law. In this case, Plaintiffs have no common law remedy or private right of action. The state RICO statute is inapplicable and the damages available pursuant to federal RICO would far exceed the damages contemplated by the Ohio legislature when enacting its insurance regulatory scheme. Moreover, the State of Ohio has filed a brief as *amicus curiae* in support of Defendants, arguing that the imposition of the federal RICO statute will impair Ohio's ability to detect insurance fraud and reverse preemption will not prevent insurers from using state or federal RICO to combat fraud. Accordingly, Plaintiffs' RICO claims are reverse preempted by the McCarran-Ferguson Act and we, therefore, affirm the district court's dismissal of Plaintiffs' RICO claims.

### D.     Plaintiffs' Request to Amend

Congress enacted ERISA, 29 U.S.C. § 1001, *et seq.*, to "protect . . . the interests of participants[7] in employee benefit plans and their beneficiaries[8] . . . by establishing standards of conduct, responsibility, and obligation *for fiduciaries of employee benefit plans*," and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b) (emphasis added). "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans."[9] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Because the record fails to identify any ERISA plan at issue or to establish Medical Mutual's status as an ERISA fiduciary, for purposes of analyzing Plaintiffs' estoppel claim, we assume, *arguendo*, that an ERISA plan is involved and that Medical Mutual is an ERISA fiduciary.[10]

---

[7]For purposes of ERISA, a "participant" is:

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).

[8]A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

[9]An "employee benefit plan" includes an "employee welfare benefit plan," which includes "any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . [that] was established or is maintained for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care benefits . . . ." 29 U.S.C. § 1002(1), (3).

[10]Under ERISA, a person is a "fiduciary" with regard to the plan to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets;
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so; or
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under [29 U.S.C. §] 1105(c)(1)(B) . . . .

29 U.S.C. § 1002(21)(A). A "person" is "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9).

Plaintiffs claim in the Fourth Count of their complaint that they were the assignees of patient benefit assignments and therefore qualified as "beneficiaries" within the meaning of ERISA. At the summary judgment stage, Defendants argued not only that Plaintiffs failed to allege the necessary facts to set forth an ERISA claim, but also that Plaintiffs' claims that they are assignees of patient benefits and, therefore, beneficiaries, were barred because of the anti-assignment provision in Medical Mutual's health care certificates. In denying Plaintiffs' request to amend, the district court noted Defendants' presentation of uncontested evidence that every insurance policy potentially at issue in this case contained an anti-assignment provision, which states:

> [Medical Mutual] is authorized to make payments directly to Providers who have performed covered services for you. [Medical Mutual] also reserves the right to make payment directly to you. When this occurs, you must pay the provider and [Medical Mutual] is not legally obligated to pay any additional amounts. You cannot assign your right to receive payment to anyone else not [sic] can you authorize someone else to receive your payments for you, including your Provider.

On appeal, Plaintiffs contend that the district court erred in denying their request to amend the complaint in order to add a federal estoppel claim. Specifically, Plaintiffs assert that Defendants paid claims Defendants believed were assigned to Plaintiffs for more than two and a half years. Accordingly, argue Plaintiffs, repeated payment pursuant to the assignments over that time period is a representation by Defendants that such assignments were acceptable.

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be freely given when justice so requires. However, a motion to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose*, 203 F.3d at 420 (citing *Thiokol*, 987 F.2d at 382-83).

Defendants argue first that as a threshold matter, Plaintiffs' request for leave to amend is procedurally improper because their request came after the district court's ruling on Defendants' motion to dismiss. Consequently, argue Defendants, the request for leave to amend must be viewed as an improper request for an advisory opinion, pursuant to this Court's opinion in *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 573 (6th Cir. 2008), that informs Plaintiffs of the complaint's deficiencies and affords the opportunity to cure those deficiencies.

We disagree. The plaintiff in *Winget* never requested leave to amend his complaint. In this case, however, there is no dispute that Plaintiffs did actually request leave to amend. Moreover, the district court has discretion regarding whether to grant leave to amend following summary judgment. *Ferris v. Santa Clara County*, 891 F.2d 715, 718 (9th Cir. 1989); *Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir. 1979); *see Humphreys v. Roche Biomedical Labs., Inc.*, 990 F.2d 1078, 1082 (8th Cir. 1993) (reviewing the district court's denial of leave to amend for an abuse of discretion after noting that summary judgment had been granted for most of the defendants at the time plaintiff moved to amend).

This Court recognizes a federal common law claim for estoppel under ERISA. In order to establish an estoppel claim: (1) there must be conduct or language that amounts to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must have the intent that the representation be acted on or the party seeking estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party seeking estoppel must reasonably or justifiably rely on the representation to his detriment. *Sprague v. General Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998) (en banc). Despite this Court's recognition of federal common law estoppel claims under ERISA, we have also stated:

> Principles of estoppel . . . cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions. . . . There are at least two reasons

> for this. First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Id.* at 404.

Plaintiffs proffer several reasons why the uncontested evidence regarding the anti-assignment provision—an affidavit from Patricia Decensi, Medical Mutual's Director of Legal Affairs—is not dispositive of their federal estoppel claim. First, Plaintiffs assert that even though the anti-assignment language is at least arguably unambiguous, the health certificates referenced by Defendants may not be plan documents at all and may not affect the terms of the plans governed by ERISA. Thus, the ban on the estoppel claims set forth in *Sprague* would not apply. This argument fails, however, because Plaintiffs offer no evidence to support these contentions.

Plaintiffs also contend that the anti-assignment provision is not dispositive because Medical Mutual failed to establish that it provided documentation of the anti-assignment provision to its insureds. In support of this assertion, Plaintiffs point to eight affidavits they submitted to the district court from patients who are insured by Medical Mutual and cite *Sprague* for the proposition that an insured or health care provider cannot be said to have unreasonably relied on an insurer's acts in the absence of proofs that the insured or health care provider is made aware of the purported unambiguous language.

We do not think *Sprague* supports Plaintiffs' argument. *Sprague* merely says that a party's reliance can rarely, if ever, be reasonable or justifiable if such reliance is "inconsistent with the clear and unambiguous terms of plan documents *available to or furnished to the party*." *Id.* (emphasis added). No language in *Sprague* suggests that an insurer has an affirmative duty to make health care providers or its insureds aware of this

kind of language.  Plaintiffs point to no authority "requiring knowledge on the part of the purported assignees nor [do they] give any reason why there should be a general requirement of knowledge."  *Wash. Hosp. Ctr. Corp. v. Group Hospitalization & Med. Servs., Inc.*, 758 F. Supp. 750, 753 (D.D.C. 1991).

Moreover, Plaintiffs have offered no evidence that Medical Mutual failed to either furnish its insureds a copy of the documents containing the anti-assignment provision or make such documents available to them.  The affidavits Plaintiffs reference do not state that Medical Mutual failed to furnish or make available the documents containing the anti-assignment provision.  Instead, the affidavits state that the insureds were never advised, informed, or told that they could not assign their health care benefits.  None of the insureds claim that Medical Mutual deprived them of access to the documents containing the anti-assignment language.  Because Plaintiffs have failed to argue that the language of the anti-assignment provision is ambiguous and have offered no evidence that Medical Mutual's insureds were deprived of access to the documents containing the anti-assignment clause, Plaintiffs' argument fails.

Plaintiffs also claim that Decensi's representation in her affidavit that every health care certificate contains an anti-assignment provision loses force in light of the fact that the claims at issue in this case involve multiple insured and self-insured arrangements sponsored by numerous employers and covering hundreds of patient-insureds.  Therefore, argue Plaintiffs, there are potentially hundreds if not thousands of documents—that may or may not include the health care certificates referenced in Decensi's affidavit—that are relevant to determining Medical Mutual's legal responsibilities to its insureds.  Given the amount of purported relevant documents, Plaintiffs contend that the district court improperly relied on just one—Decensi's affidavit— in deciding to deny leave to amend.  Again, however, Plaintiffs present no evidence to substantiate their claims regarding the relevance of other documents to the issue of denial of leave to amend.

Plaintiffs also argue that Medical Mutual only issues health care certificates in insured arrangements and thus, the anti-assignment provision in the certificate does not apply to claims of any self-insured plans at issue in the case. Defendants argue that Plaintiffs cannot rely on this argument because: (1) Plaintiffs must first pursue claims against self-insured plans before pursuing claims against a third-party administrator; and (2) Plaintiffs failed to allege, with particularized facts, that Medical Mutual is a fiduciary for purposes of ERISA. Plaintiffs counter that: (1) benefits due from self-insured plans need not be pursued against the plan prior to pursuing claims against an administrator; and (2) they did plead Medical Mutual's status as an ERISA fiduciary.

While it is true that the proper defendant in an ERISA action concerning benefits is the plan administrator, *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988), we agree with Defendants that Plaintiffs failed to set forth particularized allegations demonstrating that Medical Mutual is a "fiduciary" for purposes of ERISA. *See D'Amato v. Corporate Consulting, Inc.*, No. 94-3218, 1995 U.S. App. LEXIS 24611, at *5 (6th Cir. Aug. 28, 1995) ("Although the complaint makes a conclusory allegation that [the insurance company] was the administrator of the plan, it does not contain any factual allegations to support this conclusion . . . ."). Accordingly, although Medical Mutual could be the proper party in a benefits action, Plaintiffs failed to sufficiently plead Medical Mutual's status as an ERISA fiduciary. Moreover, Plaintiffs have failed to identify any self-insured plans allegedly at issue in this case.

Because the language of the health care certificates is unambiguous, we conclude that Plaintiffs cannot make out a viable estoppel claim. Consequently, a grant of leave to amend would be futile and we, therefore, affirm the district court's denial of leave to amend the complaint.

### III. CONCLUSION

In summary, we conclude that the district court properly dismissed Plaintiffs' RICO claims as reversed preempted pursuant to the McCarran-Ferguson Act and properly denied Plaintiffs' request for leave to amend because amendment of the

complaint would have been futile.  For these reasons, the district court's decision is **AFFIRMED**.