NEUROAXIS NEUROSURGICAL ASSOCIATES, PC, Plaintiff,

v.

COSTCO WHOLESALE COMPANY, Defendant.

Neuroaxis Neurosurgical Associates, PC, Plaintiff,

v.

Sprint Nextel Corporation, Defendant.

Neuroaxis Neurosurgical Associates, PC, Plaintiff,

v.

Aetna Health, Inc. and Aetna Health Insurance Company of New York, Defendants.

Nos. 11 Civ. 8350(DLC), 11 Civ. 8516(DLC), 11 Civ. 8756(DLC).

United States District Court, S.D. New York.

Jan. 23, 2013.

Mario David Commetti, Timothy F. Butler, Tibbetts, Keating & Butler, LLC, New York, NY, for Plaintiff.

Jodie L. Ousley, Kimberly A. O'Toole, d'Arcambal Ousley & Cuyler Burk, LLP, New York, NY, for Defendants.

*OPINION AND ORDER*

DENISE COTE, District Judge:

In these three coordinated actions, neurosurgeons associated with the plaintiff Neuroaxis Neurosurgical Associates, PC ("Neuroaxis") seek payment from welfare benefit plans for close to 200 surgical procedures performed on plan members. Neuroaxis has sued Sprint Nextel Corporation ("Sprint") and Costco Wholesale Company ("Costco"), private sector welfare plan sponsors, as well as Aetna Health Insurance Company of New York ("Aetna"), the plans' administrator. The defendants have moved to dismiss the plaintiff's claims on several grounds, three of which are addressed in this Opinion. As described below, in many instances Neuroaxis will be unable to recover against the plans because the benefit plans bar the assignment of claims by plan participants. On the other hand, two of the other issues raised by the defendants do not preclude the plaintiff's claims. Specifically, these suits are not barred by a 2003 settlement agreement ("2003 Settlement Agreement"), and upon proper application of the parties' tolling agreement, a number of the plaintiff's claims are timely under the plans' timing provisions. With the guidance given in this Opinion, the parties will be invited to identify which remaining issues require discovery or are ripe for further motion practice.

BACKGROUND

Aetna is an insurance company that administers the welfare benefits plans at issue here ("Plans"), including plans sponsored by Sprint and Costco. The majority of the Plans are sponsored by private sector employers like Sprint and Costco and as a result are governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The remainder of the Plans are administered by Aetna for government agencies and are not governed by ERISA. The Neuroaxis physicians performed approximately 182 surgeries after June 1, 2004, as out-of-network healthcare providers to patients covered by the Plans. Of these 182 surgeries, 105 were performed during the period covered by the Amended Complaints, that is, before December 31, 2007.

Neuroaxis contends that the Plans obligate the defendants to pay the doctors for the healthcare services at a "reasonable and customary rate," calculated on the basis of "the type of service provided, and the fee most commonly charged for that service" in the relevant geographic area. Neuroaxis further contends that the defendants improperly used other measures in calculating repayment rates, thereby unreasonably reducing the payments to the doctors. For instance, its complaint against Aetna asserts that Aetna ignored the "reasonable and customary" standard and used other factors to calculate payments such as "charges received by Aetna for the same service." Between the three complaints, the plaintiff claims to be owed approximately $8,481,753.

PROCEDURAL HISTORY

This litigation began on December 20, 2010, when Neuroaxis commenced an action against Aetna seeking recovery for health services provided by it from June 1, 2004 through December 31, 2007 to patients covered by employer-sponsored benefit plans administered by Aetna. The suit was filed in state court and was removed to federal court by Aetna. The parties then entered into a tolling agreement (the "Tolling Agreement"), agreed to engage in settlement negotiations, and dismissed the action. The Tolling Agreement provided that, should negotiations fail, "the Parties shall have the right to file and pursue any and all Claims in Federal Court."

The Tolling Agreement also provided that "the Timing Defenses applicable to the Claims shall be tolled during the Tolling Period," but that the Tolling Agreement would "have no effect on any Timing Defenses that may be available to Aetna or Neuroaxis" either prior to or after the expiration of the Tolling Period. The Tolling period ran from December 20, 2010 to September 16, 2011.

On October 20, 2011, Neuroaxis initiated the instant action against Aetna and on October 27, 2011, Neuroaxis filed two lawsuits against Costco and Sprint.[1] Neuroaxis filed each action in state court, and the defendants removed the actions to this Court. At a conference held on March 9, 2012, the plaintiff's motions to remand were denied since the plaintiff's claims were preempted by ERISA and properly removed.

In *Montefiore Med. Center v. Teamsters Local 272,* 642 F.3d 321, 328 (2d Cir.2011), the Second Circuit outlined a three step test, derived from *Aetna Health Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), for determining when a plaintiff's state law claims are completely preempted by ERISA. Applying this framework, this Court determined that Neuroaxis's state law claims were completely preempted by ERISA. Following the conference, Neuroaxis was given an opportunity to amend all of its complaints to plead ERISA causes of action.

Neuroaxis filed amended complaints that included ERISA claims in the Aetna and Costco matters on April 6, 2012. No amended complaint has been filed in the Sprint matter.[2] The amended complaints against Aetna and Costco assert five causes of action: 1) Failure to Abide by the Terms of ERISA-governed benefits plans in violation of 29 U.S.C. § 1104(a)(1)(D); 2) Breach of Contract; 3) Third Party Beneficiary Rights; 4) Unjust Enrichment; 5) Quantum Meruit. Neuroaxis also asserts that Aetna breached its fiduciary duties under 29 U.S.C. §§ 1022, 1104(a)(1)(A)(i), and 1106. The complaint against Sprint asserts only the four state law causes of action.

In a series of conferences, Aetna described several legal defenses that it contends bar most if not all of the claims in these actions. Since decisions on these issues will impact the scope of discovery, the Court ordered the defendants to file a motion addressed to those defenses.

Following limited discovery on threshold issues, on August 3, 2012, the defendants filed motions to dismiss in all three of these actions. The motions to dismiss address four threshold issues: 1) Whether the plaintiff has standing to sue under ERISA; 2) Whether the plaintiff's claims are barred by the timing provisions of the Plans; 3) Whether the plaintiff's claims were released under the 2003 Settlement Agreement; and 4) Whether the plaintiff has exhausted administrative remedies. The parties have attached numerous affidavits and exhibits to their motion papers. Neuroaxis filed its opposition to the motions on September 24, 2012. Briefing on the motions to dismiss was fully submitted on October 9, 2012. This Opinion addresses only the first three issues raised by the motions to dismiss.

DISCUSSION

■ When presented with a motion to dismiss, the court may not consider mat-

---

1. A related case, *Neuroaxis Neurosurgical Assocs., I.C. v. Hartford Fire Insur. Co. Employee Med. et. al.,* 12 Civ. 0522(DLC), was voluntarily dismissed by the parties on August 27, 2012.

2. By a separate Order, Neuroaxis will be required to amend its complaint to plead an ERISA action by February 6, 2013 or the action against Sprint will be dismissed.

ters outside of the pleadings without converting the motion into a motion for summary judgment. *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir.2000). A district court must ordinarily give notice to the parties before converting a motion to dismiss to a motion for summary judgment, but a party "is deemed to have notice that a motion may be converted ... if that party should reasonably have recognized the possibility that such a conversion would occur." *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir.2004) (citation omitted); *see also Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir.2009); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 573 (2d Cir.2005). Where represented parties attach to a motion to dismiss or to the opposition thereto "extensive materials that were not included in the pleadings," they "plainly should [be] aware of the likelihood of" conversion, and "cannot complain that they were deprived of an adequate opportunity to provide the materials they deemed necessary to support their" position. *Sira*, 380 F.3d at 68; *see also Aetna Cas. & Sur. Co.*, 404 F.3d at 573. In light of the parties' extensive factual submissions, it is appropriate to convert the defendants' motions to dismiss to motions for summary judgment.

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-mov-

ant's claims cannot be sustained, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Fed.R.Civ.P. 56(e); *accord Sista*, 445 F.3d at 169. Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 1. Standing to Sue under ERISA

The defendants argue that, with respect to most of the claims at issue, Neuroaxis lacks standing to sue under ERISA. More specifically, the defendants contend that most of the Plans at issue bar or' limit assignments by Plan members to healthcare providers, and since the plaintiff's standing is ostensibly based exclusively on its status as an assignee, the plaintiff lacks standing to sue.

■ Pursuant to ERISA Section 502(a)(1)(B), health plan participants and beneficiaries are authorized to bring civil enforcement actions to recover plan benefits. *See Simon v. General Elec. Co.*, 263 F.3d 176, 177 (2d Cir.2001); 29 U.S.C. § 1132. The terms "participant" and "beneficiary" are defined by statute. A "participant" is "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(2)(B)(7); *see also Simon*, 263 F.3d at 177. A "beneficiary" is "a person designated by a participant, or by

the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(2)(B)(8); *see also Simon,* 263 F.3d at 177. A person seeking to recover under ERISA qualifies as a participant or beneficiary with standing to sue as long as they have a "colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citation omitted); *see also Coan v. Kaufman,* 457 F.3d 250, 256 (2d Cir.2006).

In *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), the Supreme Court held that Section 502 permits only the parties specifically enumerated in the statute to sue for relief. *Id.* at 27, 103 S.Ct. 2841; *see also Montefiore Med. Center,* 642 F.3d at 329; *Simon,* 263 F.3d at 177. The Second Circuit, however, has carved out a "narrow exception" to this rule, holding that "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care" have ERISA standing. *Montefiore Med. Center,* 642 F.3d at 329 (citation omitted); *see also I.V. Services of America Inc. v. Trustees of the American Consulting Engineers Council,* 136 F.3d 114, 117 n. 2 (2d Cir.1998). Thus, a provider who asserts a claim as an assignee of a participant or beneficiary to an ERISA plan has standing to sue as long as the litigant has a colorable claim to that status. *Kennedy v. Connecticut Gen. Life Ins. Co.,* 924 F.2d 698, 700 (7th Cir.1991).

In order for an assignee to prevail on an ERISA claim, however, the assignee must establish the existence of a valid assignment that comports with the terms of the welfare benefits plan. As explained in *Kennedy,* a plaintiff may bring suit under Section 502(a) when he asserts a colorable claim to beneficiary status, but "[b]ecause ERISA instructs courts to enforce strictly

the terms of plans, an assignee cannot *collect* unless he establishes that the assignment comports with the plan." *Id.* at 700 (citation omitted); *see also Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.,* 371 F.3d 1291, 1293 (11th Cir.2004); *City of Hope Nat. Med. Center v. HealthPlus, Inc.,* 156 F.3d 223, 228 (1st Cir.1998).

Assuming a plan does not dictate the form of a valid assignment or bar assignment altogether, a court may draw upon federal common law in assessing whether any purported assignment was effective. *See I.V. Servs. Of Am. Inc.,* 136 F.3d at 117 n. 2. In discerning the content of federal common law, courts draw inspiration from state law to the extent that state law is not inconsistent with the federal policies underlying ERISA. *Critchlow v. First UNUM Life Ins. Co. of Am.,* 378 F.3d 246, 256 (2d Cir.2004). Valid assignments may take a variety of forms. *Montefiore Med. Center,* 642 F.3d at 329 n. 8. At common law, an assignment can be made "either orally or by writing" unless a statute or contract provides otherwise. Restatement (Second) of Contracts § 324. Under New York law "[n]o particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Leon v. Martinez,* 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 638 N.E.2d 511 (1994). *But see Hobbs v. Blue Cross Blue Shield of Alabama,* 276 F.3d 1236, 1241 (11th Cir.2001) (requiring written assignment).

As noted, however, where plan language unambiguously prohibits assignment, an attempted assignment will be ineffectual. *See Physicians Multispecialty Group,* 371 F.3d at 1295; *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v.*

*Wal–Mart Stores,. Inc.,* 298 F.3d 348, 352 (5th Cir.2002); *City of Hope,* 156 F.3d at 229; *Davidowitz v. Delta Dental Plan of Calif., Inc.,* 946 F.2d 1476, 1481 (9th Cir. 1991). Thus, a healthcare provider who has attempted to obtain an assignment in contravention of a plan's terms is not entitled to recover under ERISA.

■ In determining whether contract language prohibits assignment to a healthcare provider, courts apply traditional principles of contract interpretation. *See LeTourneau* 298 F.3d at 352; *cf. Critchlow,* 378 F.3d at 256; *City of Hope,* 156 F.3d at 229. The Second Circuit "interpret[s] ERISA plans in an ordinary and popular sense as would a ·person of ·average intelligence and experience." *Critchlow,* 378 F.3d at 256. Furthermore, because the Second Circuit applies "rules of contract law to ERISA plans, a court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." *Burke v. PriceWaterHouseCoopers LLP Term Disability Plan,* 572 F.3d 76, 81 (2d Cir.2009) (citation omitted).

■ As mentioned above, some of the Plans are governmental plans, and therefore are not governed by ERISA. 29 U.S.C. § 1003(b)(1). Some of the governmental welfare benefits plans may be governed by state law. While no party expressly addresses the law that applies to the non-ERISA Plans, the defendants have relied upon New York law, and the plaintiff has not taken issue with that choice nor relied on the law of any other jurisdiction.[3] Under New York law, unambiguous contract provisions that limit a party's ability to assign its rights under the contract render any purported assignment

void. *Allhusen v. Caristo Const. Corp.,* 303 N.Y. 446, 452, 103 N.E.2d 891 (1952); *see also Spinex Laboratories Inc. v. Empire Blue Cross and Blue Shield,* 212 A.D.2d 906, 906–07, 622 N.Y.S.2d 154, 155 (N.Y.App.Div. 3d Dept.1995); *Cole v. Metro. Life Ins.,* 273 A.D.2d 832, 833, 708 N.Y.S.2d 789 (N.Y.App.Div. 4th Dept. 2000).

The plaintiff has alleged a colorable claim to assignee status and is thus entitled to sue under ERISA. Specifically, the plaintiff contends that it should be permitted to prove the existence of valid assignments by means of 1) written assignments to Neuroaxis surgeons; 2) written assignments to a hospital where Neuroaxis surgeons rendered care; 3) patient intake forms; 4) oral assignments; or 5) requests for payment forms submitted by Neuroaxis to Aetna. The plaintiff has submitted no proof of any assignment, however, for 111 of its claims. Following the guidance given in this Opinion, the plaintiff will be permitted a further opportunity to show a valid assignment of claims for reimbursement arising under Plans that permit assignments. Without further factual development it cannot be determined whether each of these purported forms of assignment was effective.

Turning to the merits, at least 75 of the claims at issue arise from Plans that contain some version of an anti-assignment clause. These· clauses limit the right to assign a claim in one or more of the following four ways and may prevent recovery by the plaintiff. One type of clause provides that coverage, or rights to Plan benefits, can only be assigned by a Plan member or covered person with the consent of

---

**3.** The sponsors for the government Plans include federal and local government entities as well as the United Nations. The parties have not addressed which law applies to each of these entities and it appears that it is unnecessary to do so to resolve the issues reached in this Opinion.

Aetna. ("Consent Clause"). For instance, the GE Healthcare Preferred Plan, states that:

> A covered person may assign his or her right to receive plan benefits to a health care provider *only with the consent of the benefits administrator*, in its sole discretion, except as may be required by applicable law. Assignments must be in writing. If benefits are assigned in accordance and a health care provider submits claims on behalf of a covered person, benefits will be paid to that health care provider.[4]

(Emphasis supplied.)

Another category of non-assignment clause states that rights under the Plans are personal to the member and categorically may not be assigned ("Personal Rights Clause"). For instance, the Rubies Costume Company Plan provides that:

> All rights of the member to receive benefits hereunder are personal to the member and may not be assigned.

A third category of non-assignment clause prohibits assignment except in limited circumstances or when otherwise permitted by the Plan ("Limited Circumstances Clause"). For example, the Sprint Plan provides that:

> Except under limited circumstances, your benefits cannot be assigned and transferred to another person or organization.

Lastly, some of the non-assignment clauses provide that the contract-holder or policy-holder may not assign coverage or benefits without the consent of the Plan administrator ("Contract–Holder Clause"). For example, the Bank of Tokyo—Mitsubishi Plan provides that:

> No rights or benefits under this group agreement are assignable by contract holder to any other party unless approved by HMO.[5]

Two of these four categories of clauses bar the claims asserted by Neuroaxis on

---

**4.** Other language falling in the "Consent Clause" category includes the following four examples: 1) Coverage may be assigned only with the written consent of Aetna. To the extent allowed by law, Aetna will not accept an assignment to an out-of-network provider, provider or facility including but not limited to, an assignment of: a) The benefits due under this contract; b) The right to receive payments due under this contract; or c) Any claim you make for damages resulting from a breach or alleged breach, of the terms of this contract; 2) Coverage may be assigned only with written consent of Aetna; 3) Coverage may be assigned only with written consent of Aetna. Aetna will not accept an assignment to an out-of-network provider or facility an assignment of the benefits due under this contract, the right to receive payments due under this contract or any claim you make for damages resulting from a breach or alleged breach; and 4) Rights and benefits cannot be assigned to anyone except when allowed under the Plan. You may authorize the administrator to make payments directly to providers for covered services. However, the adminis-

trator reserves the right to make payments directly to you. You cannot assign your right to receive payment to anyone else without written consent of the Plan, except as required by a qualified medical child support order (QMCSO) or any applicable state law.

**5.** Other language falling in the "Contract–Holder Clause" category includes the following two examples: 1) No rights or benefits under this Policy are assignable by the Policyholder to any other party unless approved by Us[.] Coverage may be assigned only with the written consent of Aetna. To the extent allowed by law, Aetna will not accept an assignment to an out-of-network provider, including but not limited to, an assignment of: a) The benefits due under this group insurance policy; b) The right to receive payments due under this group insurance policy; or c) Any claim you make for damages resulting from a breach or alleged breach, of the terms of this group insurance policy; and 2) No rights or benefits under this policy are assignable by the policyholder to any other party unless approved by us.

behalf of participants in Plans that contain these clauses. In those two instances, Neuroaxis has failed to show that Plans containing these clauses have permitted them to pursue these claims on the basis of a valid assignment of rights.

The plain meaning of the Consent Clauses is that assignments are prohibited without the consent of the administrator, here, Aetna. The defendants have presented evidence that consent to assignments was never requested from Aetna and that consent was never given for any assignment. The plaintiff has offered no evidence that consent was requested or received for any assignment, but seeks to take discovery of Aetna and Plan members to develop such evidence. Accordingly, Neuroaxis will be given an opportunity to take targeted discovery to show that Aetna provided consent for Neuroaxis to obtain assignments of claims from Plan members under Plans containing Consent Clauses.

■ The Personal Rights Clauses are more categorical. The Personal Rights Clauses in the Plans are identical or nearly identical to the clause interpreted in *City of Hope*. In *City of Hope*, the welfare benefits plans provided that "All entitlements of a member to receive covered rights are personal and may not be assigned." *City of Hope*, 156 F.3d at 229. The First Circuit held that this language prohibited the plan participant from assigning her rights to the healthcare provider and, as a result, the defendant insurance carrier was entitled to judgment as a matter of law. *Id.* As a result, Plans with Personal Rights Clauses render any purported assignment void.

The Limited Circumstances Clauses are less categorical than the Personal Rights Clauses, but in this case, the difference is not significant. These clauses provide that, except in limited circumstances or as specifically provided by the Plans, benefits may not be assigned to another person or organization. The plaintiff has not argued that the assignments they purportedly received fall within the limited circumstances in which assignments are permissible. Accordingly, the purported assignments of claims accruing under Plans with Limited Circumstances Clauses are also invalid.

The final category of non-assignment language—the Contract–Holder Clauses—requires a more extended discussion. As mentioned, these clauses prohibit the contract-holder or policy-holder from assigning rights and benefits under the Plans. The plaintiff argues that this language does not prohibit Plan members from assigning their rights and benefits to healthcare providers because the Plans define the contract-holder or policy-holder as the employer or the company sponsoring the Plan. For example, claim 150 is asserted under a Plan that contains a Contract–Holder Clause. The Group Agreement that covers this claim defines the contract-holder as "Astoria Federal Savings." By the plain terms of the Group Agreement, the contract-holder is not a Plan member and this language does not prohibit Plan members from assigning their rights to healthcare providers. Thus, to the extent that Plans containing Contract–Holder Clauses define the contract-holder or policy-holder as the employer or Plan sponsor, those clauses would not bar Plan members from granting assignments to healthcare providers.

To be clear, while the Contract–Holder Clauses do not prohibit Plan members from granting assignments to healthcare providers, to the extent the Plans contain other non-assignment clauses, those other clauses may bar the members from granting assignments. For example, claims 101 and 102 are asserted under Plans that contain Contract–Holder Clauses as well as Personal Rights Clauses. Thus, while

the Contract–Holder Clauses in those Plans do not affect the Plan members' ability to grant assignments, the Personal Rights Clauses do.

The plaintiff makes principally five arguments against construing the anti-assignment clauses to invalidate its purported assignments of rights. First, the plaintiff argues that the Personal Rights Clauses should be interpreted to bar only those assignments that are made to other creditors of a Plan participant, rather than to healthcare providers. In support of its argument, Neuroaxis relies on *Hermann Hospital v. MEBA Medical & Benefits Plan*, 959 F.2d 569 (5th Cir.1992). In *Hermann Hospital* the relevant non-assignment language read as follows:

> No employee, dependent or beneficiary shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment hereunder, and any such payment shall not be subject to any legal process to levy executing upon or attachment or garnishment proceedings against for the payment of any claims.

*Id.* at 574. The Fifth Circuit interpreted the anti-assignment clause as applying only to unrelated, third-party assignees—other than the health care provider of assigned benefits—such as creditors who might attempt to obtain voluntary assignments to cover debts having no nexus with the Plan or its benefits, or even involuntary alienations such as attempting to garnish payments for plan benefits.

*Id.* at 575. In support of this determination, the Fifth Circuit emphasized "the typical 'spendthrift' language of the clause." *Id.*

The Personal Rights Clause described above, however, does not contain "typical spendthrift" language. Instead, it is either identical or very nearly identical to the anti-assignment clause construed in *City of Hope*, where the First Circuit held that the clause barred the attempted assignment to the healthcare provider. *City of Hope*, 156 F.3d at 229. The Personal Rights Clauses are general and broad. They do not take the form of traditional spendthrift clauses and there is no basis to find that they were meant to apply only to third-party creditors other than healthcare providers.

Next, Neuroaxis argues that in a number of the Plans Aetna reserved discretion to make payments directly to out-of-network healthcare providers. This reservation, Neuroaxis argues, demonstrates that the Plans are not meant to prohibit assignments by Plan members to healthcare providers. But, the fact that Aetna has reserved for itself the right to make direct payments to healthcare providers does not suggest that the Plan members also have the right to unilaterally assign rights to healthcare providers.

 A related argument made by Neuroaxis is that because Aetna accepted direct billing from Neuroaxis and made direct reimbursement payments to Neuroaxis on each claim, Aetna is estopped from relying on the anti-assignment provisions in the Plans. Principles of estoppel can be applied in the ERISA context in "extraordinary" circumstances. *Schonholz v. Long Island Jewish Med. Center*, 87 F.3d 72, 78 (2d Cir.1996). Estoppel in ERISA cases, as in other cases, has three elements: (1) material representation, (2) reliance and (3) damage. *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993). Prior payments to healthcare providers do not create a "viable estoppel claim," however, where ERISA plans unambiguously prohibit assignments. *Riverview Health Institute LLC v. Med. Mutual of Ohio*, 601 F.3d

505, 523 (6th Cir.2010). The Sixth Circuit explained the reasoning behind this conclusion as follows:

Principles of estoppel cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions. There are at least two reasons for this. First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Riverview Health Institute LLC,* 601 F.3d at 521 (citation omitted).

The Personal Rights and Limited Circumstances Clauses unambiguously prohibit assignments, as does the Consent Clause in the absence of consent from Aetna. Thus, the defendants are not estopped from relying on the Plans' anti-assignment provisions as a defense to the plaintiff's claims.

Next, Neuroaxis argues that the breach of anti-assignment clauses by the Plan members entitles the defendants to damages from the Plan members, but does not affect the validity of the assignments to Neuroaxis. It relies on the principle under New York law that "covenants not to assign [are treated] as personal covenants whose breach justifies only an award of damages, unless the language of the covenant clearly indicates a stronger intent." *Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266, 268 (2d Cir.1983); *see also* Restatement (Second) of Contracts § 322.

As explained above, however, New York considers an assignment "void" when contracts unambiguously prohibit assignments. *Allhusen,* 303 N.Y. at 452, 103 N.E.2d 891. Moreover, federal courts routinely enforce anti-assignment clauses in ERISA-governed welfare plans. *See, e.g., Physicians Multispecialty Group,* 371 F.3d at 1295 (11th Cir.2004); *LeTourneau Lifelike Orthotics & Prosthetics, Inc.,* 298 F.3d at 352; *City of Hope,* 156 F.3d at 229; *Davidowitz,* 946 F.2d at 1481. Similarly, unambiguous anti-assignment clauses in government welfare benefit plans have also been enforced. *See, e.g., Cole,* 273 A.D.2d at 832–33, 708 N.Y.S.2d at 790.

■ Lastly, the plaintiff argues that Aetna is barred from relying on any Plan's anti-assignment clause because § 7.13 of the 2003 Settlement Agreement, discussed at greater length below, binds Aetna. Section 7.13 states that

[Aetna] shall recognize all valid assignments by Plan Members of Plan benefits to Physicians; provided that [Aetna] shall not be obligated to recognize such assignments in any market in which a competitor with substantial market share declines to recognize similar benefits assignments.

Section 12.1(a) of the 2003 Settlement Agreement dictates the exclusive forum for enforcement of this settlement term. It states that

All Compliance Disputes shall be directed not to the Court nor to any other state court, federal court, arbitration panel or any other binding or non-binding dispute resolution mechanism but to the Compliance Dispute Facilitator to be designated by Class Counsel. [Aetna] shall publish on the Public Website the name and address of the Compliance Dispute Facilitator. The proposed Order and Final Judgment shall provide that no state or federal court or dispute

resolution body of any kind shall have jurisdiction over any enforcement of § 7 of this Agreement at any time, including without limitation through any form of review or appeal, except to the extent otherwise provided in this Agreement.

Accordingly, Neuroaxis must raise Aetna's purported failure to comply with § 7.13 of the 2003 Settlement Agreement with the "Compliance Dispute Facilitator," and may not rely on § 7.13 in litigation before this Court.

2. Release by Settlement Agreement

Aetna next asserts that the plaintiff's claims are barred by the terms of a settlement entered in 2003 in a multi-district class action law suit. The settlement, which binds Neuroaxis, does not prevent it from pursuing these post-settlement claims.

On October 24, 2003, the Southern District of Florida entered an Order approving a settlement agreement that arose out of the *In re Managed Care Litigation,* Case. No. 1:00–MDL–1334 ("MDL 1334") ("the 2003 Settlement"). In MDL 1334, healthcare providers alleged that Aetna systematically undercompensated in-network and out-of-network providers. The parties do not dispute that Aetna was a released party under the 2003 Settlement and that Neuroaxis, as a class member that did not opt-out, is bound by it. The 2003 Settlement Agreement provides that Aetna

> shall be released ... [by] all Class Members who have not validly and timely requested to Opt–Out of this Agreement ... from any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, *claims,* liabilities and demands of whatever kind or character, *arising on or before the Preliminary Approval Date,* that are, were or could

have been asserted against any of the Released Parties based on or arising from the factual allegations of the Complaint.

(Emphasis supplied.) The complaint to which this provision refers is the Provider Plaintiffs' Second Amended Consolidated Class Action Complaint ("the 1334 Complaint"). The Preliminary Approval Date is May 30, 2003.

The parties do not agree on which jurisdiction's law should be applied to the 2003 Settlement Agreement. The defendants rely primarily on New York law, while the plaintiff cites cases from the Eleventh Circuit. The 2003 Settlement Agreement itself provides that

> [Aetna] and the Signatory Medical Societies agree that, with respect to disputes arising between and among such Persons, this Agreement shall be governed by and construed in accordance with the *laws of the State of Florida,* without regard to the conflicts of law rules of such state.

(Emphasis supplied.) The 2003 Settlement Agreement, over which the federal court continues to exercise jurisdiction, thus adopted Florida law for the construction of its terms. The 2003 Settlement Agreement's choice of Florida law will be honored here.

██ Under Florida law, settlement agreements are interpreted in accordance with traditional contract principles. *Comm. Capital Resources LLC v. Giovannetti,* 955 So.2d 1151, 1153 (Fla.Dist.Ct. App.2007). Terms of a settlement agreement "are to be given their plain and ordinary meaning, and it is not for the court to add or subtract any language from the face of a clearly worded agreement." *Schwartz v. Florida Bd. of Regents,* 807 F.2d 901, 905 (11th Cir.1987) (applying Florida law). It is a deeply rooted principle of Florida law, that "the intent of the

parties controls interpretations of their releases." *Wachovia Ins. Servs. Inc. v. Toomey*, 994 So.2d 980, 986 (Fla.2008) (citation omitted). Accordingly, "[i]n construing a release agreement, the court must look first to the intent of the parties as expressed in the document itself." *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1103 (5th Cir.1981) (applying Florida law). If the language of the release is clear and unambiguous, a court will "not entertain evidence contrary to its plain meaning." *Cerniglia v. Cerniglia*, 679 So.2d 1160, 1164 (Fla.1996).

The parties dispute whether the claims made by the plaintiff here "aris[e] from the factual allegations of the [1334] Complaint" and were therefore released under the 2003 Settlement. It is unnecessary to resolve that dispute since the 2003 Settlement only bars claims that arose "on or before the Preliminary Approval Date," that is, May 30, 2003. The language of the release is clear and unambiguous. Therefore, the release does not bar the claims pressed here, the earliest of which arose in 2004. *See In re Managed Care Litigation*, 2010 WL 6532982, *12 (S.D. Fla. Aug. 15, 2010).

Aetna argues that claims arising after 2003 may nonetheless be barred by the 2003 Settlement since the 2003 Settlement Agreement contained a broad release and Aetna made changes to its business practices in reliance on that release. Aetna contends that Neuroaxis must pursue any complaint it might have that Aetna has failed to comply with the 2003 Settlement Agreement through the 2003 Settlement Agreement's enforcement mechanism. Finally, it points out that the Southern District of Florida recently relied on the 2003 Settlement to enjoin an action that was seemingly based on conduct occurring after 2003. *In re Managed Care Litigation*, No. 00 MDL 1334, 2011 WL 1522561 (S.D.Fla. Mar. 8, 2011) (adopting Magistrate Judge's report and recommendation).

Aetna's effort to bar all future claims that may be filed against it by healthcare providers who were class members in the MDL 1334 arising from reimbursement practices that may have existed prior to the Preliminary Approval Date of the 2003 Settlement, may be swiftly rejected. Aetna does not rely on the doctrine of either claim or issue preclusion to dismiss the Neuroaxis claims. As already explained, the terms of the release in the 2003 Settlement Agreement are unambiguous and cannot be construed to bar reimbursement claims for surgeries performed after May 30, 2003.

### 3. Time Limitations

The final issue to be addressed in this Opinion is whether the plaintiff has lost the right to benefit from the Tolling Agreement because it breached its terms. The defendants assert that 49 claims are time barred; the plaintiff asserts that many of those claims are timely if it may rely on the tolling period contained in the Tolling Agreement.[6]

On May 19, 2011, the parties entered a Tolling Agreement in which they agreed that "the Timing Defenses applicable to the Claims shall be tolled during the Tolling Period." The parties agree that the Tolling Agreement expired on September 16, 2011. The defendants argue that Neuroaxis may not take advantage of the Tolling Agreement because it breached its terms by reinitiating its law suits in state court rather than federal court.

---

**6.** For instance, the plaintiff contends that if Aetna's proposed accrual date is used to calculate the running of the Plan's time limitations, and if the Tolling Agreement is applied, claims 76, 77, 101, 102, 154, 155, and 156 are timely.

■ The Tolling Agreement did not prohibit the plaintiff from re-initiating suit in state court. Rather, the Tolling Agreement provides that "if a settlement of all issues is not reached between the parties, the Parties shall have the right to file and pursue any and all Claims in Federal Court and to seek any and all legal remedies that may be available." This language is permissive rather than mandatory. *Cf. Global Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 224–26 (2d Cir.2011) (forum selection clause); *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 979–80 (2d Cir.1993) (same). Accordingly, the parties shall take the Tolling Agreement into account when calculating whether any of the plaintiff's claims are time barred.

## CONCLUSION

The defendants' August 3, 2012 motions to dismiss are granted in part. In summary, the plaintiff has failed to demonstrate that it received valid assignments of rights with respect to claims arising under ERISA-governed welfare Plans containing Personal Rights Clauses or Limited Circumstances Clauses. Accordingly, the plaintiff's ERISA causes of action are dismissed with respect to those claims. Claims asserted against Aetna, however, are not barred by the 2003 Settlement. Lastly, the parties must take the Tolling Agreement into account when calculating whether any of the plaintiff's claims are time barred.