NEUROLOGICAL SURGERY, P.C.,
and William J. Sonstein, M.D.,
Plaintiffs,

v.

TRAVELERS COMPANY, Defendant.

15–cv–6843 (SJF)(AYS)

United States District Court,
E.D. New York.

Signed 03/21/2017

---

Colleen M. Tarpey, Roy W. Breitenbach, Marc Andrew Sittenreich, Garfunkel Wild, P.C., Great Neck, NY, for Plaintiffs.

Thomas A. Martin, Putney, Twombly, Hall & Hirson LLP, New York, NY, for Defendant.

## OPINION AND ORDER

FEUERSTEIN, District Judge:

On October 29, 2015, plaintiffs Neurological Surgery, P.C. ("Neurological") and William J. Sonstein, M.D. ("Sonstein") (together, "Plaintiffs") commenced this action against defendant Travelers Company ("Travelers") by filing a summons with notice in the Supreme Court of the State of New York, County of Nassau. In their summons with notice, Plaintiffs, a Long Island-based neurological surgery medical practice and a physician affiliated with the practice, described the nature of their action as one asserting claims under the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and various state-law causes of action. Plaintiffs sought at least $278,278.68 in damages for Traveler's "failure to timely and properly pay in full claims submitted to [Travelers] by Plaintiffs for medical health care services Plaintiffs provided to [Travelers'] employees pursuant to a health benefits plan adminis-

tered by [Travelers] for the benefit of its employees and others." On December 1, 2015, Travelers removed the action to this Court, invoking this Court's jurisdiction under section 502(e) of ERISA, 29 U.S.C. § 1132(e).

■ On January 14, 2016, Plaintiffs filed a complaint in this Court, asserting seven causes of action: 1) recovery of benefits due under an ERISA insurance plan, pursuant to 29 U.S.C. § 1132(a)(1)(B); 2) recovery of attorneys' fees and costs under ERISA, pursuant to 29 U.S.C. § 1132(g)(1); 3) breach of contract; 4) breach of implied-in-fact contract; 5) unjust enrichment; 6) violation of New York Insurance Law § 3224–a (the "Prompt Pay Law"); and 7) breach of third-party-beneficiary contract. On April 8, 2016, Travelers moved to dismiss Plaintiffs' ERISA claims pursuant to Rule 12(b)(6) for lack of statutory standing and, alternatively, for failure to plead a breach of the ERISA

plan. Travelers moved to dismiss Plaintiffs' state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that they are preempted by ERISA and, alternatively, that Plaintiffs' failed to adequately plead facts supporting such claims. (Dkt. 12).[1] For the following reasons, Travelers' motion is granted insofar as Plaintiffs' ERISA claims are dismissed for lack of statutory standing and denied insofar as the Court concludes that Plaintiffs' state law claims are not preempted by ERISA and declines to exercise supplemental jurisdiction over those claims.

## I. BACKGROUND[2]

### A. Out-of-Network Medical Services and the Allegedly Deficient Payment

Neurological is a Long Island-based neurological surgery practice with offices throughout Long Island and in Manhattan, and Sonstein is a New York-licensed phy-

---

1. Arguments that a plaintiff lacks constitutional standing are properly raised pursuant to Rule 12(b)(1), as a plaintiff's constitutional standing implicates a court's subject matter jurisdiction. *See, e.g., Cortlandt Street Recovery Corp. v. Hellas Telecommunications I, S.a.r.l.,* 790 F.3d 411, 416–17 (2d Cir. 2015) ("A district court properly dismisses an action under [Rule] 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when ... the plaintiff lacks constitutional standing to bring the action."). Travelers does not argue that Plaintiffs lack Article III standing, but that Plaintiffs lack standing under the ERISA statute to sue for benefits under the relevant employee health insurance plan. Accordingly, Travelers properly raises its lack of ERISA standing argument under Rule 12(b)(6). *See Griffin v. Gen. Mills Inc.,* 634 Fed.Appx. 281, 284 (11th Cir. 2015) ("Although courts have long applied the label of 'statutory standing' to the basis for decisions such as the district court's here, that Dr. Griffin lacked standing under ERISA, the Supreme Court has cautioned that this label is 'misleading' because the court is not deciding whether there is subject matter jurisdiction

but rather whether the plaintiff 'has a cause of action under the statute.' ... Put differently, we understand the district court's decision that Dr. Griffin lacked statutory standing to be a determination that she failed to state a claim under [Rule] 12(b)(6).") (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.,* ––– U.S. –––, 134 S.Ct. 1377, 1387–88 & n. 4, 188 L.Ed.2d 392 (2014)); *Merrick v. UnitedHealth Group Inc.,* 175 F.Supp.3d 110, 116 n. 9 (S.D.N.Y. 2016) (distinguishing between Article III standing and statutory standing in ERISA case).

2. The facts set forth herein are derived from Plaintiffs' complaint, the allegations of which are accepted as true for present purposes, and other relevant documents that are incorporated by reference or are otherwise integral to the allegations in the complaint, such as ERISA plan documents. *See, e.g., DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991); *In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litigation,* 763 F.Supp.2d 423, 565 (S.D.N.Y. 2011).

sician employed by Neurological. (*See* Complaint ("Compl.") (Dkt. 6) ¶¶ 1–3, 13, 14). Travelers, a corporation organized under the laws of Minnesota with its principal place of business in New York City, "is one of the nation's largest property casualty companies ..., with more than 30,000 employees, 13,000 independent agents, and multiple market segments across the personal, business, financial and international insurance groups." (*Id.* ¶¶ 4, 15). "[A] substantial number of Travelers' employees receive health benefits through a benefits plan administered and funded by Travelers, which is a benefit plan established pursuant to [ERISA]." (*Id.* ¶ 5).[3] While Travelers funds and administers the Plan, Blue Cross and Blue Shield of Minnesota ("BCBS Minnesota") functions as the Plan's claims administrator. (*See* Plan at 1, 5, 15). Plaintiffs allege that, as the Plan's funder and administrator, Travelers "make[s] determinations regarding [P]lan interpretation, coverage, the awarding or denial of benefits, the processing and determination of appeals, and the payment of benefits." (*Id.* ¶ 22).

The Plan distinguishes between "in-network" healthcare providers, which have contracts with BCBS Minnesota and/or other Blue Cross and Blue Shield affiliates across the country, with out-of-network providers, which do not. (Compl. ¶¶ 7–8; Plan at 1, 8, 9, 84). For example, the Plan notes that, while "[m]ost In–Network [Providers] have agreed to accept as full payment ... an amount that [BCBS Minnesota] has negotiated with its In–Network Providers," "[w]hen [a Plan participant] use[s] an Out-of-Network Provider, benefits are substantially reduced and [the Plan participant] will likely incur significantly higher out-of-pocket expenses." (Plan at 8, 9). Neurological, by its own choice, is a

non-participating, out-of-network provider in the networks of BCBS Minnesota, Empire HealthChoice HMO, Inc. ("HealthChoice HMO"), Empire HealthChoice Assurance ("HealthChoice Assurance"), and/or Blue Cross and Blue Shield of New York ("BCBS NY"), which Plaintiffs refer to collectively as "Empire." (Compl. ¶¶ 1, 10, 28).

Plaintiffs allege that "[a] number of Neurological['s] ... patients have health insurance coverage from Empire, through their employer, Travelers, or are members, subscribers, or beneficiaries of plans for which Travelers is the plan sponsor or administrator." (*Id.* ¶ 21). Plaintiffs allege that, "[n]otwithstanding its status as an Empire non-participating provider, Neurological ... routinely receives authorization and assignments from its patients who are Travelers employees or their eligible family members to receive payment directly from Travelers, through its agent Empire, for the medical services that Neurological ... and its physicians render to Travelers employees and their eligible family members." (*Id.* ¶ 10). One such patient is MA, the spouse of a Traveler's employee and a Plan beneficiary, to whom Neurological provided "medically necessary health services in connection with MA's diagnosis of displacement of the lumbar intervertebral disc without myelopathy," on March 12, 2013. (*Id.* ¶ 48; *see id.* ¶¶ 1, 11, 49–51).

Plaintiffs allege that "[o]n or around March 27, 2013, Neurological sent Empire a bill in the amount of $285,900" for the medical services it had provided to MA, but that Neurological "only received $7,621.32 on this claim, far below what Empire, acting as Travelers' agent, was obligated to pay." (*Id.* ¶¶ 51, 53). Plaintiffs do not specify from whom Neurological

---

**3.** A copy of the relevant Travelers' ERISA health insurance plan, entitled "Travelers Blue Cross Blue Shield Plan" (the "Plan"), is attached to the Declaration of Doreen A. Mohs (Dkt. 13) as Exhibit 2.

received $7,621.32. Plaintiffs allege that, "[p]ursuant to the terms of the relevant Travelers health plan documents and agreements, Empire, acting as Travelers' agent was obligated to reimburse Neurological ... in full—or at the very least at a usual, customary, or reasonable amount— for medically necessary health care services provided to MA," but that Travelers has refused to do so. (*Id.* ¶¶ 51, 53). The Plan provides that "[f]or services received from an Out-of-Network Provider ..., the allowed [amount] will be [based on one of five calculation methods], to be determined by [BCBS Minnesota] at its discretion." (Plan at 9). Not one of the five out-of-network payment calculation methods set forth in the Plan is the full amount charged by the out-of-network provider or the "usual, customary, or reasonable" charge. (*See id.*).[4] In fact, the Plan provides that, "[i]n determining the allowed amount for Out-of-Network Providers, [BCBS Minnesota] makes no representations that the allowed amount is a usual, customary or reasonable charge from a provider." (*Id.*).

Plaintiffs allege that "Travelers, Empire, and Neurological ... communicated with each other numerous times—including on 3/28/13, 4/1/13, 4/29/13, 5/8/13, 5/15/13, 5/21/13, 6/3/13, 6/6/13, 6/14/13, 6/17/13, 6/27/13, 8/28/13, 8/29/13, 8/30/13, 9/19/13, 11/12/13, and 2/27/15—about the status of the pending claim," and that Neurological "appealed the claim on or about October 30, 2013" but "[t]hat appeal has gone unanswered." (Compl. ¶¶ 52, 54). Plaintiffs do not specify which of the entities that they refer to collectively as "Empire" they communicated with—BCBS Minnesota, HealthChoice HMO, HealthChoice Assurance, and/or BCBS NY—or divulge the modes or contents of such communications. Plaintiffs allege that these "repeated attempts to communicate with Travelers and Empire about the status of the claim for health care services provided to MA ... have fallen on deaf ears, as Travelers has failed and refused to honor its obligations regarding claim reimbursement." (*Id.* ¶ 55).

## B. The Alleged Assignment and the Plan's Anti–Assignment Provisions

Plaintiffs allege that "MA, a Travelers health plan beneficiary, has assigned MA's right to receive benefits under the health plan at issue to Neurological," and that Neurological is thus pursuing its ERISA claims in its capacity as an assignee of MA. (*Id.* ¶¶ 66–67; *see id.* ¶ 32). Plaintiffs did not attach the alleged assignment to their complaint or opposition papers, and neither the complaint nor the opposition brief quotes or otherwise describes any of the alleged assignment's terms. Plaintiffs allege that "[r]egardless of whether or not the applicable health plan at issue contains an anti-assignment clause, Empire, acting as Travelers' agent, accepted and acknowledged the assignments of benefits at issue in this lawsuit because ... [Empire] communicated with and otherwise dealt directly with Neurological ... in connection with the health claim at issue," and that "[s]uch dealings and course of conduct overrode and effected a waiver of any anti-assignment clause." (*Id.* ¶ 31). The Plan does contain several provisions implicating a Plan beneficiary's ability to assign her benefits and her right to challenge a benefits determination in court.

---

4. The five out-of-network payment methods set forth in the Plan are: 1) "a percentage, not less than 200%, of the Medicare allowed charge for the same or similar service"; 2) "based upon a Minnesota out-of-network provider fee schedule posted at the Claims Administrator's website"; 3) "a percentage of billed charges"; 4) "pricing determined by another Blue Cross or Blue Shield plan"; or 5) "pricing based upon a nationwide provider reimbursement database." (Plan at 9).

### 1. Plan Provisions Regarding Assignment of Benefits

The Plan contains three interrelated provisions that limit a beneficiary's ability to assign her benefits to an out-of-network provider. The "Coverage Information, General Provider Payment Methods" section of the Plan provides, in pertinent part:

> The allowed amount for a [sic] out-of-network Provider amount is usually less than the allowed amount for an In–Network Provider for the same service and can be significantly less than the Out-of-Network Provider's billed charges. You will be paid the benefit under the Plan and **you are responsible for paying the Out-of-Network Provider.** *The only exception to this is stated in CLAIMS PROCEDURES, Claims Payment.* This amount can be significant and the amount you pay does not apply toward any out-of-pocket maximum contained in the Plan.

(Plan at 9) (bold font and capitalization in original; italic font added). The "Claims Procedures, Claims Payment" section provides, in pertinent part:

> When a claimant uses an In–Network or Out-of-Network Participating Provider, the Plan pays the provider. When a claimant uses an Out-of-Network Nonparticipating Provider, the Plan pays the claimant. **A claimant may not assign his or her benefits to an Out-of-Network Nonparticipating Provider, except when parents are divorced. In the case of divorce, the custodial parent may request, in writing, that the Plan pay an Out-of-Network Nonparticipat-**ing **Provider for covered services for a child.** When the Plan pays the provider at the request of the custodial parent, the Plan has satisfied its payment obligation. This provision may be waived for certain institutional and medical/surgical providers outside the state of Minnesota at the discretion of the Claims Administrator [BCBS Minnesota].

(*Id.* at 22) (emphasis added).[5] The "Coverage Information, General Provider Payment Methods" section of the Plan also has a table providing an example of how much a beneficiary might pay out-of-pocket for an in-network provider whose total bill is $150 versus an out-of-network provider whose total bill is $150. (*See id.* at 9–10). Below the table is an asterisk, next to which it says:

> The Claims Administrator will, in most cases, pay the benefits for any covered health care services received from an Out-of-Network Provider directly to the member based on the allowed amounts and subject to the other applicable limitations in the Plan. **An assignment of benefits from a member to an Out-of-Network Provider generally will not be recognized, except in the instance in which a custodial parent requests, in writing, that the Plan pay a [sic] Out-of-Network Provider for covered services for a child.**

(*Id.* at 10) (emphasis added).

### 2. Plan Provisions Regarding Assignment of Right to Sue

The Plan contains three provisions that ostensibly prevent a beneficiary from as-

---

5. An "In–Network Provider" is defined as "[a] provider that has entered into a specific network contract with the Claims Administrator or with the local Blue Cross and/or Blue Shield Plan." (Plan at 82). An "Out-of-Network Provider" is defined as "[a] provider that has not entered into a BlueCard PPO network contract." (*Id.* at 84). A "Participat-ing Provider" is defined as "[a] provider who has entered into a specific network contract with the Claims Administrator or the local Blue Cross and/or Blue Shield Plan." (*Id.* at 85). Neurological is thus an Out-of-Network Nonparticipating Provider. (*See* Compl. ¶¶ 10, 28).

signing her right to challenge a benefits determination in court:

- If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court . . .; **however, you may not assign, convey, or in any way transfer your right to bring a lawsuit to anyone else.** (*Id.* at 73) (emphasis in original).

- A claimant may not assign to any other person or entity his or her right to legally challenge any decision, action, or inaction of the Claims Administrator. (*Id.* at 22).

- The Plan benefits described in this Summary Plan Description are intended solely for the benefit of you and your covered dependents. No person who is not a Plan participant or dependent of a Plan participant may bring a legal or equitable claim or cause of action pursuant to this Summary Plan Description as a third party beneficiary or assignee hereof. (*Id.*).

## II. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), district courts "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868

**6.** A "participant" is "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose

(2009)). "[A] complaint is not required to have 'detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). When deciding a motion to dismiss, a court may consider not only the allegations in the complaint, but also documents that are incorporated by reference or are otherwise integral to the allegations in the complaint, such as ERISA plan documents. *See, e.g., DiFolco*, 622 F.3d at 111; *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litigation*, 763 F.Supp.2d 423, 565 (S.D.N.Y. 2011).

## III. DISCUSSION

### A. Plaintiffs' Standing to Pursue ERISA Claims

Plaintiffs' first cause of action is pursuant to section 502(a)(1)(B) of ERISA, which allows a "participant or beneficiary" to sue "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Plaintiffs' second cause of action is pursuant to section 502(g)(1) of ERISA, which provides that, "[i]n any action under [section 502] . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "Section 502(a)(1)(B) limits the class of individuals who can sue to recover benefits due . . . to those individuals who are 'participants' or 'beneficiaries' of a benefits plan." *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 176 (2d Cir. 2001).[6] The Supreme Court has held that

beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(2)(B)(7). A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(2)(B)(8).

only the parties set forth in section 502 may sue for relief under that section. *Franchise Tax Bd. of State of Cal. v. Const. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The Second Circuit has carved out a "narrow exception" to this general rule: "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care" also have standing under ERISA to sue for the recovery of benefits. *Simon*, 263 F.3d at 178. This is the narrow exception upon which Plaintiffs rely to assert their ERISA claims.

Plaintiffs argue that, "[i]n [their] Complaint, [they] sufficiently demonstrated that they have such standing by alleging that MA, a participant in or beneficiary under the Plan, assigned his healthcare benefits to them in exchange for the medically necessary, covered health care services that they provided to him on March 12, 2013." (Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Opp. Br.") (Dkt. 16) at 6). Plaintiffs' argument that they have statutory standing to sue Travelers for the alleged underpayment of benefits hinges on the validity of the purported assignment of benefits from MA to Plaintiffs. *See Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, 13–cv–6551 (TPG), 2014 WL 4058321, at \*3 (S.D.N.Y. Aug. 15, 2014) ("[I]n order for [healthcare provider] plaintiffs to bring a claim related to a particular health insurance plan, plaintiffs must have obtained a valid assignment under that plan."); *Neuroaxis Neurosurgical Associates, PC v. Costco Wholesale Co.*, 919 F.Supp.2d 345, 351 (S.D.N.Y. 2013) ("In order for an assignee to prevail on an ERISA claim ..., the assignee must establish the existence of a valid assignment agreement that comports with the terms of the welfare benefits plan."). If the assignment is valid, the Plaintiffs have standing; if the assignment is invalid, they do not.

## 1. Does the Plan's Anti–Assignment Provisions Render the Alleged Assignment Invalid?

 Where a healthcare provider asserts standing to sue for benefits allegedly due under its patient's ERISA plan as an assignee of those benefits, as Plaintiffs do here, it must establish that its patient assigned his rights in accordance with the terms of the ERISA plan. In determining the validity of an assignment in an ERISA action, courts "draw upon federal common law in assessing whether any purported assignment was effective." *Neuroaxis*, 919 F.Supp.2d at 351 (citing *I.V. Services of America Inc. v. Trustees of the American Consulting Engineers Council*, 136 F.3d 114, 117 n. 2 (2d Cir. 1998)); *accord Merrick v. UnitedHealth Group Inc.*, 175 F.Supp.3d 110, 117 (S.D.N.Y. 2016) ("The validity of assignments for ERISA purposes is a question of federal common law.") (internal quotations and alterations omitted). While federal courts may "draw inspiration from state law" in an ERISA action, they should not apply state law where it is "inconsistent with the federal policies underlying ERISA." *Neuroaxis*, 919 F.Supp.2d at 351 (citing *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004)); *Cf. Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 85 n. 5 (2d Cir. 2001) ("[I]n ERISA cases, state law does not control. Instead, general common law principals apply."); *Schonholz v. Long Is. Jewish Med. Ctr.*, 87 F.3d 72, 79 (2d Cir. 1996) ("ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans ... We are not bound by New York law ...") (internal citations omitted).

 In determining whether an ERISA plan's anti-assignment provisions render an alleged assignment invalid,

courts interpret the relevant provisions " 'in an ordinary and popular sense as would a person of average intelligence and experience.' " *Neuroaxis*, 919 F.Supp.2d at 352 (quoting *Critchlow*, 378 F.3d at 256). Thus, "where plan language unambiguously prohibits assignment, an attempted assignment will be ineffectual" and the healthcare provider purporting to be an assignee will lack statutory standing to sue for benefits. *Id.* at 351; *see Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir. 2004); *LeTourneau Life-like Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 352 (5th Cir. 2002); *City of Hope Nat. Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 229 (1st Cir. 1998); *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F.2d 1476, 1481 (9th Cir. 1991). " '[A] court must not rewrite, under the guise of interpretation, a term of the contract where the term is clear and unambiguous.' " *Neuroaxis*, 919 F.Supp.2d at 352 (quoting *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d Cir. 2009)).

Travelers argues that Plaintiffs lack standing as purported assignees because the Plan contains unambiguous provisions prohibiting a beneficiary from assigning both the right to payment for out-of-network services and the right to sue to collect benefits. (*See* Defendant's Memorandum of Law in Support of Motion to Dismiss ("Mov. Br.") (Dkt. 14) at 6–8; Defendant's Reply Memorandum in Support of Motion to Dismiss ("Reply Br.") (Dkt. 17) at 4–9). Plaintiffs argue that the Plan's provisions regarding the assignment of benefits to an out-of-network provider are ambiguous and indicate that, "at least in certain instances, health care providers will be paid directly or an assignment of benefits will be permitted." (Opp. Br. at 8). In support of this argument, Plaintiffs selectively quote language from the "Coverage Information, General Provider Payment Methods" section of the Plan:

> "For instance, the Plan states that the 'Claims Administrator will, *in most cases*, pay the benefits for any covered health care services received from an Out-of-Network provider directly to the member,' and that an 'assignment of benefits from a member to an Out-of-Network Provider *generally* will not be recognized.' "

(Opp. Br. at 7–8) (quoting Plan at 10) (emphasis in original). Plaintiffs ignore the rest of the provision. In full, it provides that "[a]n assignment of benefits from a member to an Out-of-Network Provider will not be recognized, *except in the instance in which a custodial parent requests, in writing, that the Plan pay a [sic] Out-of-Network Provider for covered services for a child.*" (Plan at 10) (emphasis added).[7] Plaintiffs also ignore provisions in the "Coverage Information, General Provider Payment Methods" and "Claims Procedures, Claims Payment" sections of the Plan, which together provide

---

7. The Court takes note of the fact that the relevant "Claims Procedures, Claims Payment" provision also provides that "[t]his provision may be waived for certain institutional and medical/surgical providers outside the state of Minnesota at the discretion of the Claims Administrator [BCBS Minnesota]." (Plan at 22). However, this provision does not alter the Court's analysis because: (i) any party to a contract can waive a contractual provision, whether the option to waive is explicitly stated or not; (ii) Plaintiffs do not claim that Neurological falls within the class of "certain institutional and medical/surgical providers outside the state of Minnesota" that the provision applies to; and (iii) as discussed below, Plaintiffs have not sufficiently alleged that BCBS Minnesota, Travelers, or any other entity they label "Empire" waived the provisions barring the assignment of benefits or the right to sue.

that a Plan member "will be paid the benefit under the Plan and [is] responsible for paying the Out-of-Network Provider," with "[t]he only exception" being "when parents are divorced ... [and] the custodial parent ... request[s], in writing, that the Plan pay an Out-of-Network Nonparticipating Provider for covered services for a child." (Plan at 9, 22).

■ "Language in a plan is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the *entire agreement*." *Critchlow*, 378 F.3d at 256 (internal quotations and alterations omitted) (emphasis added). Reading the relevant provisions together and giving them their plain meaning, the Plan unambiguously bars a Plan member from assigning his right to payment for out-of-network healthcare services to an out-of-network provider except where the member is a divorced custodial parent who requests in writing that the Plan directly remit payment to an out-of-network provider for services rendered to the divorced custodial parent's child. Plaintiffs allege that they rendered out-of-network services to MA, a Travelers employee's spouse, and that MA purported to assign his benefits to Neurological. Therefore the Plan's narrow exception for healthcare services rendered to the child of a divorced custodial parent does not apply.

In *Neuroaxis*, an ERISA case involving multiple benefits plans with different types of anti-assignment clauses, Judge Cote determined that anti-assignment clauses falling into a category that she labeled "Limited Circumstances Clauses" unambiguously barred assignments and rendered any purported assignments of benefits under the plans that contained such provisions invalid. 919 F.Supp.2d at 353–54. An exemplar Limited Circumstances Clause was:

Except under limited circumstances, your benefits cannot be assigned and transferred to another person or organization.

*Id.* at 353. Judge Cote held that, despite the fact that the Limited Rights Clauses were "less categorical" than clauses that unqualifiedly provided that benefits "are personal to the member and may not be assigned," the alleged assignments were invalid because the "plaintiff ha[d] not argued that the assignments they purportedly received fall within the limited circumstances in which assignments are permissible." *Id.* at 353–54. Read together, the three Plan provisions barring a claimant from assigning his benefits to an out-of-network provider except in limited circumstances that are inapplicable here are analogous to the "limited circumstances clauses" that were determined to invalidate the purported assignments in *Neuroaxis*. There is no reasoned basis to reach a different conclusion in this case.

Plaintiffs rely principally upon two cases from district courts within this Circuit to argue that the Plan's anti-assignment provisions do not render the purported assignment from MA to Neurological invalid. First, Plaintiffs cite *Semente v. Empire Healthchoice Assurance, Inc.*, 147 F.Supp.3d 117 (E.D.N.Y. 2015). In that ERISA case, Judge Hurley applied New York law rather than federal common law to hold that an anti-assignment clause that did not explicitly state that an assignment would be "void" did not invalidate the assignment. 147 F.Supp.3d at 121–22. While New York law does demand that anti-assignment clauses contain highly specific language to render an assignment invalid, *see, e.g.*, *Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F.Supp.3d 191, 226 (S.D.N.Y. 2014), both the plaintiff and the defendant in *Semente* agreed that New York law governed the analysis of the assignment's validity. *See id.* at 121; *see also Merrick*, 175 F.Supp.3d at 117 n. 11

(distinguishing *Semente* on the ground that the parties agreed that New York law governed). The parties in this case do not agree that New York law governs, and, in determining the meaning and effect of the Plan's anti-assignment provisions in this ERISA action, this Court is not bound by New York law, particularly where it conflicts with federal common law. *See Schonholz*, 87 F.3d at 79; *see also Neuroaxis*, 919 F.Supp.2d at 356 (whereas "under New York law ... covenants not to assign are treated as personal covenants whose breach justifies an award of damages, unless the language of the covenant clearly indicates a stronger intent," "federal courts routinely enforce anti-assignment clauses in ERISA-governed welfare plans" without requiring such specific language).

Plaintiffs also rely upon *Protocare of Metropolitan N.Y., Inc. v. Mutual Ass'n Administrators, Inc.*, 866 F.Supp. 757 (S.D.N.Y. 1994). In that case, the ERISA plan's anti-assignment provision provided that "no participant ... has the right to assign ... his/her legal or beneficial interest in the benefits," and one sentence later provided that the plan allowed for "direct payment of benefits to a health care provider ... solely for the convenience of the participant ... and [at the] discretion[ ] [of] ... the Plan ..." 866 F. Supp. At 761. Judge Mukasey held that the healthcare provider plaintiff had standing to sue because "[i]f the Plan had intended to prevent all assignments ..., then it would not have preserved the discretion to pay Protocare directly." *Id.* at 762. Unlike the *Protocare* court, the issue before this Court is not whether the Plan intended to prevent *all* assignments, but whether it intended to prevent *this* assignment. The Plan does permit assignment of benefits in certain limited circumstances not relevant here. *See Merrick*, 175 F.Supp.3d at 123 (finding "decision[s] that give effect to the plain language of anti-assignment provisions" "more persuasive" than *Protocare* ).

Finally, though Travelers referred to them in their moving brief (Mov. Br. at 3–4), Plaintiffs fail to address in their opposition papers the Plan provisions that prevent a member or beneficiary from assigning his right to sue. Again, the Plan provides:

- If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court ...; **however, you may not assign, convey, or in any way transfer your right to bring a lawsuit to anyone else.** (Plan at 73) (emphasis in original).

- A claimant may not assign to any other person or entity his or her right to legally challenge any decision, action, or inaction of the Claims Administrator. (*Id.* at 22).

- The Plan benefits described in this Summary Plan Description are intended solely for the benefit of you and your covered dependents. No person who is not a Plan participant or dependent of a Plan participant may bring a legal or equitable claim or cause of action pursuant to this Summary Plan Description as a third party beneficiary or assignee hereof. (*Id.*).

By failing to address these provisions in their opposition papers, Plaintiffs have abandoned any argument on this issue. *See, e.g., Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 468 (S.D.N.Y. 2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument.") (citing *Robinson v. Am. Int'l Grp., Inc.*, 08 Civ. 1724, 2009 WL 3154312, at *4 n. 65 (S.D.N.Y. Sept. 30, 2009)). In any event, these provisions unqualifiedly and unambiguously bar a Plan member or beneficiary from assigning his right to sue to an out-of-network provider or anyone

else. *See Neuroaxis*, 919 F.Supp.2d at 353–54 (anti-assignment clause providing that "[a]ll rights of the member to receive benefits are personal to the member and may not be assigned" rendered purported assignments under plans containing such clause void). Accordingly, the Plan's anti-assignment clauses render MA's purported assignment to Neurological of his benefits and his right to sue void absent Travelers' waiver of those provisions.

## 2. Did Traveler's Waive the Plan's Anti–Assignment Provisions?

 "Waiver arises when a party has voluntarily or intentionally relinquished a known right." *Merrick*, 175 F.Supp.3d at 122 (internal quotations omitted); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right and mere silence, oversight or thoughtlessness in failing to object to a breach of the contract will not support a finding of waiver.") (internal quotations and citations omitted). Plaintiffs first argue that they "alleged numerous dates on which [Neurological] communicated with Travelers, Empire, and BCBS [Minnesota] regarding the medical claim at issue" and that neither "Travelers [nor] its agents raise[d] the purported non-assignment language in the Plan as its reason for denying or underpaying the claim." (Opp. Br. at 10). The complaint alleges only that "Travelers, Empire, and Neurological . . . communicated with each other numerous times—including on 3/28/13, 4/1/13, 4/29/13, 5/8/13, 5/15/13, 5/21/13, 6/3/13, 6/6/13, 6/14/13, 6/17/13, 6/27/13, 8/28/13, 8/29/13, 8/30/13, 9/19/13, 11/12/13, and 2/27/15—about the status of the pending claim," and that Neurological "appealed the claim on or about October 30, 2013" but "[t]hat appeal has gone unanswered." (Compl. ¶¶ 52, 54). The complaint says nothing about the methods or contents of the communications or which of the four entities Plaintiffs label "Empire" Neurological spoke with, and provides no indication that Travelers voluntarily or intentionally waived the anti-assignment provisions. Mere silence regarding the anti-assignment provisions does not constitute a waiver of those provisions.

 Plaintiffs also argue that, "the very fact that Travelers already rendered partial payment on the claim is evidence that Travelers, through its agents, waived the anti-assignment provisions and accepted the assignment of benefits to Plaintiffs." The complaint alleges that Neurological "has only received $7,621.32 on this claim" (Compl. ¶ 53) without specifying whom Neurological received the payment from. Even assuming Travelers / BCBS Minnesota paid Neurological directly, thereby waiving the provisions providing that Travelers would pay Plan members directly for out-of-network services rather than paying the out-of-network healthcare provider, such direct payment would not constitute a waiver of the provisions unequivocally preventing a Plan member / beneficiary from assigning to any third party his right to sue. *See Merrick*, 175 F.Supp.3d at 122–26 (insurer's direct payment to healthcare provider, which the plan allowed the insurer to do at its discretion, did not constitute a waiver of provisions prohibiting plan member from assigning his benefits).[8] Plaintiffs have failed

---

8. The same reasoning applies to Plaintiffs' argument that Travelers waived the anti-assignment provisions because "[i]n administering this Plan and other ERISA plans, Plaintiffs have repeatedly received direct payment from Empire, regardless of any anti-assignment language in the applicable plan documents." (Opp. Br. at 11). The fact that Plain-

to allege that Travelers waived the provisions preventing Plan members from assigning their right to sue and—given that Travelers' central argument on this motion is that Plaintiffs lack standing—it is clear Travelers has not waived these provisions. Accordingly, the alleged assignment from MA to Neurological is invalid based upon the Plan's unambiguous anti-assignment provisions, Travelers did not waive those provisions, and Plaintiffs thus lack standing to pursue their ERISA claims.

## B. Plaintiffs' State Law Claims

### 1. State Claims are Not Preempted by ERISA

■■■ In addition to their ERISA claims, Plaintiffs assert five state law claims: three breach of contract claims (third, fourth, and seventh causes of action); an unjust enrichment claim (fifth cause of action); and a New York Prompt Pay Law claim (sixth cause of action). Travelers argues that all of these state claims, with the possible exception of the Prompt Pay Law claim, are preempted by ERISA. The Court disagrees.

■■■ Generally speaking, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with clear congressional intent to make the ERISA remedy exclusive and is therefore preempted." *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 209, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004); *see North Shore-Long Island Jewish Health Care Sys. v. Multiplan, Inc.,* 953 F.Supp.2d 419, 427 (E.D.N.Y. 2013) ("where a plaintiff brings a state law claim that is in reality an ERISA-claim cloaked in state-law language, ERISA's preemption power will take effect"). The Supreme Court has developed a two-part test to determine whether state claims are preempted by

ERISA: "claims are completely preempted by ERISA if they are brought (i) by 'an individual [who] at some point in time, could have brought his claim under ERISA § 502(a)(1)(B)' and (ii) under circumstances in which 'there is no other independent legal duty that is implicated by a defendant's actions.'" *Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 328 (2d Cir. 2011) (quoting *Davila,* 542 U.S. at 210, 124 S.Ct. 2488) (alteration in original). "The test is conjunctive; a state-law cause of action is preempted only if both prongs of the test are satisfied." *Id.* (internal citations omitted).

The Second Circuit has disaggregated the first *Davila* prong into two steps: "First, we consider whether the plaintiff is the *type* of party that can bring a claim pursuant to § 502(a)(1)(B); and second, we consider whether the *actual claim* that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *Id.* (emphasis in original). As to the first step of the first *Davila* prong, a plaintiff is the type of party who can bring a claim under section 502(a)(1)(B) if he has statutory standing to sue under that section. *See North Shore-Long Island Jewish Health Care Sys.,* 953 F.Supp.2d at 428 ("Stated differently, the Court considers whether [the plaintiff] has standing to sue under ERISA."); *Conn. Gen. Life Ins. Co. v. Advanced Chiropractic Healthcare,* 54 F.Supp.3d 260, 269 (E.D.N.Y. 2014) ("A state law claim is preempted under ERISA's civil enforcement section if brought ... by an individual who has standing to assert rights under § 502(a)(1)(B)."). As discussed above, Plaintiffs lack standing to assert their ERISA claims. Plaintiffs are therefore not the type of parties that could have brought

tiffs may have received payment directly from "Empire" in the past does not constitute a

waiver of the provisions barring MA from assigning his right to sue in this case.

claims under section 502(a)(1)(B), and their state law claims are not preempted by ERISA. *See Shuriz Hishmeh M.D. v. Empire Healthchoice HMO, Inc.*, No. 16-cv-2780(ADS)(ARL), 2017 WL 663543, at *5 (E.D.N.Y. Feb. 17, 2017) (plaintiff's state law claims were not preempted where the court had determined that plaintiff lacked statutory standing to sue under section 502(a)(1)(B), as the defendants had argued). Accordingly, Travelers' motion to dismiss Plaintiffs' state law claims on ERISA preemption grounds is denied.

### 2. The Court Declines to Exercise Supplemental Jurisdiction

 Travelers alternatively moves to dismiss Plaintiffs' state law claims for failure to adequately plead facts that could give rise to a claim for relief. Plaintiffs, both from New York, and Travelers, with its principal place of business in New York, are not diverse. (Compl. ¶¶ 13–15). In light of the dismissal of Plaintiffs' ERISA claims, the Court does not have federal question jurisdiction pursuant to 28 U.S.C. § 1331. In the absence of complete diversity between the Plaintiffs and Travelers, the Court does not have jurisdiction under 28 U.S.C. § 1332. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. *See* 28 U.S.C. § 1367(c)(3); *see also Shuriz Hishmeh M.D.*, 2017 WL 663543, at *5 (declining to exercise supplemental jurisdiction over healthcare provider plaintiff's state law claims where parties were not diverse, plaintiff lacked standing to sue under ERISA, and state claims were not preempted by ERISA); *Am. Psychiatric Assoc. v. Anthem Health Plans*, 50 F.Supp.3d 157, 170 & n. 13 (D. Conn. 2014) (declining to exercise supplemental jurisdiction over plaintiff's state law claims where plaintiff lacked standing to sue under ERISA; permitting plaintiff to pursue non-preempted state claims in state court).

### IV. CONCLUSION

For the reasons set forth above, Travelers' motion to dismiss is granted to the extent that Plaintiffs' ERISA claims are dismissed with prejudice due to Plaintiffs' lack of statutory standing to assert such claims. Travelers' motion is denied insofar as Plaintiffs' state law claims are not preempted by ERISA and the Court declines to exercise supplemental jurisdiction over those claims. The Clerk of the Court is directed to close this case.

**SO ORDERED.**